Argued and submitted May 31, reversed and remanded October 18, 1989

# STATE OF OREGON,
*Appellant,*

*v.*

# PEPE GLENN RIVAS,
*Respondent.*

## (87-944; CA A48028)

781 P2d 364

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Wayne Mackeson, Portland, argued the cause for respondent. With him on the brief was Des Connall and Dan Lorenz, P.C., Portland.

Before Graber, Presiding Judge, and Riggs and Edmonds, Judges.

GRABER, P. J.

## GRABER, P. J.

Defendant is charged with aggravated murder with a firearm, aggravated felony murder with a firearm, and robbery in the first degree with a firearm. ORS 163.095; ORS 164.415; ORS 161.610. Before trial, he moved to suppress virtually all of the evidence against him. The trial court granted most of the motion, suppressing all statements made during the police interview that began after defendant's arrest on October 9, 1987, and all property belonging to him that was seized from the Wallis home. The state appeals. ORS 138.060(3). We reverse and remand for further proceedings.[1]

Defendant lived in the Wallis home, where he shared a bedroom with Gerald Wallis.[2] On October 6, 1987, detective Gaskins of the Tualatin Police Department spoke to defendant and Gerald at Tualatin police headquarters concerning a series of nine robberies at ice cream stores. The last of the robberies involved the murder of the manager of a store where defendant had worked.

On October 9, defendant and Gerald were arrested for unauthorized use of a motor vehicle. Immediately after that arrest, Gaskins again spoke to defendant about the robberies. Later that night, at about 7 p.m., Gerald returned to the police station and admitted his and defendant's participation in the robberies and the murder. Gerald told the police that defendant had committed the killing.

The police decided to arrest defendant for one of the robberies. Officer King went to a pub where defendant worked. He asked the hostess if defendant was there. She replied that he was and led King into the kitchen, where he arrested defendant at about 9 p.m.

---

[1] Defendant, a juvenile when he allegedly committed the crimes, was remanded to circuit court. We affirmed that decision without opinion. *State ex rel Juv. Dept. v. Rivas*, 97 Or App 327, 776 P2d 884, *rev den* 308 Or 405 (1989).

[2] Unless otherwise noted, the facts that we state are undisputed in the record.

"It is the task of the trial judge to make findings of historical fact. This means nothing more or less than that the trial judge must evaluate the evidence, resolve conflicts therein, find what happened and set forth (preferably in writing) what the judge finds." *State v. Wise*, 305 Or 78, 81, 749 P2d 1179 (1988).

King took defendant to the municipal building[3] and obtained some background information from him. Next, Gaskins advised defendant of his *Miranda* rights and asked if he understood them. Defendant replied affirmatively and, when Gaskins asked if he had any questions about his rights, he said, "No." Gaskins then questioned defendant about the robberies. Gaskins testified that he re-advised defendant of his *Miranda* rights each time that he began to question him about a different robbery. After discussing eight of the robberies, Gaskins questioned him about the one that involved the murder. Defendant confessed to that robbery and the murder.

After the interview ended, at about 1:00 a.m. on October 10, defendant consented, in writing, to a search of the Wallis residence. Gerald and his father, Barry Wallis, had already consented to a search of the residence. The police, with defendant's assistance, searched the home and found potentially incriminating evidence, including the alleged murder weapon. The police then took defendant to the ice cream store where the murder had occurred and, with defendant's participation, videotaped a re-enactment of the crimes. At about 4:30 a.m., the police took defendant to the county juvenile detention center.

Defendant offered several grounds for suppressing the statements that he made on October 9 and 10. The trial court agreed with two of defendant's theories. First, the court allowed, without explanation, a motion to suppress all evidence "gained * * * by means of a warrantless arrest."

■■ Defendant claims that his warrantless arrest in the kitchen of the pub where he worked violated both Article I, section 9, and the Fourth Amendment. He contends that a warrant is required for every felony arrest or, at least, for an arrest in a non-public place (including the non-public part of an otherwise public establishment). He does not assert that the police lacked probable cause to arrest him. A warrant is not required in order to arrest a person in a public place. ORS 133.235(5); ORS 133.310(1); *State v. Mace,* 67 Or App 753, 756-57, 681 P2d 140, *rev den* 297 Or 339 (1984); *United States*

---

[3] The police initially detained defendant in municipal offices one floor above and in the same building as the police offices. The parties dispute whether the place where defendant was detained was "a police station, jail, prison or other place where adults are detained" within the meaning of ORS 419.575(2). As discussed in the text, *infra,* we leave that issue for the trial court to consider on remand.

*v. Watson,* 423 US 411, 96 S Ct 820, 46 L Ed 2d 598 (1976). Assuming, without deciding, that the two constitutions otherwise required the police to obtain a warrant to enter the restaurant kitchen, one was not necessary here, because the hostess who led King to the kitchen consented to his entry and to the search for defendant. *See State v. Tanner,* 304 Or 312, 321, 745 P2d 757 (1987).

In *State v. Pearson,* 83 Or App 624, 732 P2d 937 (1987), we explained that the test for third party consent is the same under both constitutions:

"In *State v. Scott,* 82 Or App 645, 729 P2d 585 (1986), we adopted, for purposes of Article I, section 9, the 'common authority' test of *United States v. Matlock,* 415 US 164, 94 S Ct 988, 39 L Ed 2d 242 (1974). Under that test, a warrantless search is valid if made pursuant to consent lawfully obtained 'from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.' 415 US at 171. *Matlock* explains the 'common authority' concept:

" 'The authority which justifies the third party consent * * * rests * * * on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.' 415 US at 172 n 7." 83 Or App at 627.

*See also City of Portland v. Paulson,* 98 Or App 328, 779 P2d 188 (1989); *State v. Rohrbach,* 93 Or App 608, 763 P2d 196 (1988). Defendant does not dispute that the hostess had joint access and control, with others, over the kitchen or that she had authority to consent. She, in fact, consented to the entry and search.[4] *See State v. Ledbetter,* 95 Or App 187, 190, 768

---

[4] The hostess testified:

"A man came in and asked if Pepe was working. And I said, yes, he was, and if he'd like to wait I'd go get him for him.

"I started to walk back into the back into the kitchen, and the man started following me. I said I'll go get him. And he showed me his badge, said he was an officer.

"I said, oh, okay.

"We went back into the kitchen and he was talking to Pepe."

When asked whether the officer obtained consent to go into the kitchen from the

P2d 431 (1989); *United States v. Lopez-Diaz,* 630 F2d 661 (9th Cir 1980). Accordingly, the arrest did not violate defendant's constitutional rights.

▪ The trial court based its suppression of the statements that defendant made on October 9 and 10 on a second reason, as well, that the police did not comply with the *Miranda* requirements. The police advised defendant of his *Miranda* rights and asked if he understood them; defendant responded that he did. The police then questioned him. The trial court reasoned that *Miranda* absolutely required the police, after they had apprised defendant of his rights, *expressly* to ask if he still wished to speak with them. They did not do that. The court explained:

> "The Tualatin police flat did not comply with Miranda. It's clear as a bell what they need to do. Detective Gaskins admitted that he didn't ask Rivas if he knowingly waived those rights that were on page 2 of Exhibit 42. * * *
>
> "* * * * *
>
> "They never asked him to waive it. They gave him his rights, do you understand them? Yes. Away they went; therefore the court has no alternative based on the law but to suppress the confession stated there."

*Miranda* requires no express waiver, but only that a defendant be adequately and effectively apprised of his rights. *North Carolina v. Butler,* 441 US 369, 373, 99 S Ct 1755, 60 L Ed 2d 286 (1979). The "ability to question a custodial suspect after warning is not dependent upon a statement by him that he is willing to make a statement." *State v. Matt,* 251 Or 134, 137, 444 P2d 914 (1968); *accord: State v. Wright,* 251 Or 121, 444 P2d 912 (1968).

Defendant further argues that *Miranda*-type warnings *and* an express waiver "ought to be required under Article I, section 12 of the Oregon Constitution." Nothing in the opinions of the Supreme Court or of this court suggests that

---

hostess, the manager, or defendant, the hostess replied:

> "I — I guess it was my consent because I led him back there.
>
> "* * * * *
>
> "Once he showed me his badge I let him come back."

The officer was alone and not in uniform at the time.

Oregon law provides a different standard for waiver of constitutional rights than does federal law. Indeed, defendant points to no Oregon case that holds in his favor.

The trial court erred in holding that an express waiver of *Miranda* rights is required, as a matter of law, and in suppressing defendant's statements on the ground that he gave no express waiver. We remand for the trial court to make further findings and to determine whether, in the light of all the facts and circumstances, defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. *Miller v. United States,* 396 F2d 492, 495 (8th Cir 1968), *cert den* 393 US 1031 (1969).

The trial court also faulted the police for questioning defendant about the murder and robbery only after they had questioned him first about the other robberies. The court appeared to believe that the police had to "give those [*Miranda*] warnings until they're redundant" before asking about different crimes and that, by allegedly failing to do so here, the police had "sprung the trap" when they questioned defendant about the homicide. It is not clear whether the court based its ruling suppressing the October 9 and 10 statements on those observations. We address the issue, because it will arise on remand.

It is undisputed that the crimes were discussed in chronological order. The police testified that they reminded defendant, before moving to each successive crime, of the rights of which they had previously advised him, but the trial court may not have believed that testimony.[5] Even if it did not, however, a *Miranda* warning need not, as a matter of law, be repeated each time the interrogation moves to a different crime. *See State v. Davidson,* 252 Or 617, 620, 451 P2d 481 (1969); *Miller v. United States, supra,* 396 F2d at 495-496. On remand, the trial court should make pertinent findings and

---

[5] The trial court expressed doubt about the officers' testimony but did not make explicit findings about their credibility or about what occurred. The court said:

"Furthermore, the initial rights that were given at ten o'clock, 10:09, were based, basically, on the arrest of Rivas that was for armed robbery, they questioned him about separate armed robberies. And then, of course, it's very questionable to have tapes and then long gaps in between where he says, year [*sic*], I told him about his rights. We don't know what really went on at that time."

take them into account in deciding whether defendant waived his *Miranda* rights, voluntarily, knowingly, and intelligently.

Because of its resolution of the *Miranda* issue, the trial court did not decide whether defendant's statements were freely and voluntarily made. If they were not, they must be suppressed. *See* Or Const, Art I, § 12; ORS 136.425(1); *State v. Smith,* 301 Or 681, 692, 701, 725 P2d 894 (1986). That issue, too, must be considered on remand.

■     Defendant argues that his statements were involuntary as a matter of law and should be suppressed, because his detention following the arrest violated various provisions of the juvenile code. *See* ORS 419.569; 419.573; 419.575(2). Violation of those statutes does not necessarily require suppression, however. *State v. Raiford,* 7 Or App 202, 209-210, 488 P2d 295, 490 P2d 206 (1971). Rather, such violations "are factors to be considered in determining whether a juvenile's [statements are] voluntary." 7 Or App at 210.[6] On remand, the trial court should first consider which, if any, statutes were violated, make appropriate findings, and then consider any violations as factors bearing on the voluntariness of defendant's statements.

■     In addition, defendant asks that we adopt the "interested adult rule," which he describes this way:

> "Under the 'interested adult' rule, 'no juvenile can be deemed to have voluntarily, knowingly and intelligently waived his privilege against self-incrimination and his right to counsel without first being provided the opportunity to consult with, and have present at interrogation, an adult who is informed of the juvenile's rights and is interested in the juvenile's welfare.' *See State v. Benoit,* 126 NH 6, [15], 490 A2d 295 (1985)." (Other citations omitted.)

We decline to adopt that rule. Instead, all the facts and circumstances of a child's detention, including the child's susceptibility to interrogation, mental condition, and level of maturity, are factors to be considered in determining whether the child voluntarily, knowingly, and intelligently waived his or her rights and whether the statements were voluntary. *See*

---

[6] To the extent that the cited portions of *State v. Raiford, supra,* are *dicta,* we adopt them as our holding. The defendant there did not assert the statutory violations until he petitioned this court for rehearing. 7 Or App at 210.

*State ex rel Juv. Dept. v. Sanders,* 56 Or App 724, 729-30, 643 P2d 384 (1982).

■ Finally, the trial court suppressed all evidence seized in the search of the Wallis residence that was "strictly the property of the Defendant," on the ground that defendant's consent to the search was tainted by his illegally obtained confession.[7] Although we direct the court to reconsider whether the confession was legally obtained, the resolution of that question is not controlling. The police had consent from Barry and Gerald Wallis to search the house. There is no dispute but that those consents were valid. Gerald shared a room with defendant, and Barry, who owns the home with his wife, considered himself free to enter that bedroom, as well as the rest of the house, at any time. On those facts, the Wallises could consent to a search of the entire premises, and anything found was properly seized, regardless of who owned it. *See State v. Lynch,* 94 Or App 168, 172, 764 P2d 957 (1988); *see also State v. Tanner, supra,* 304 Or at 321; *State v. Pearson, supra,* 83 Or App at 628.

Reversed and remanded for proceedings not inconsistent with this opinion.

---

[7] The trial court granted defendant's "Motion to Suppress (No. 2)," which attacked the validity of the warrantless arrest. That motion also sought to suppress, among other things, "all evidence seized during a warrantless search of the [Wallis] residence." As discussed above, we reverse the trial court's decision concerning that motion.