Argued and submitted March 4, affirmed in part; reversed in part and remanded
May 22, 1991

STATE OF OREGON,
*Appellant,*

*v.*

RONALD J. CHAPMAN,
*Respondent.*

STATE OF OREGON,
*Appellant,*

*v.*

MICHAEL VINCENT LEYVA,
*Respondent.*

STATE OF OREGON,
*Appellant,*

*v.*

STEVEN SUNDEEN,
*Respondent.*

(89-902, 89-903, 89-904; CA A64174)

813 P2d 557

Jonathan H. Fussner, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Richard L. Wolf, Oregon City, argued the cause for respondent Ronald J. Chapman. With him on the brief was Wm. David Falls, Oregon City.

David K. Allen, Deputy Public Defender, Salem, argued the cause for respondent Michael Vincent Leyva. With him on the brief was Sally L. Avera, Public Defender, Salem.

Howard Clyman, West Linn, argued the cause and filed the brief for respondent Steven Sundeen.

Before Buttler, Presiding Judge, and Rossman and De Muniz, Judges.

DE MUNIZ, J.

Buttler, P. J., concurring in part; dissenting in part.

## DE MUNIZ, J.

Defendants were charged with manufacture and possession of a controlled substance. ORS 475.992(1)(b); ORS 475.992(4)(b). The state appeals the suppression of evidence in a pre-trial hearing. We reverse in part and remand.

On Sunday morning, July 30, 1989, residents of a home on Washington Street in Oregon City noticed that a van had pulled into the driveway of a neighboring house and that two men were walking back and forth between the van and the house. Fearing that a burglary was in progress, they dialed 911. In response, Officer Fourier arrived at 9:25 a.m. and saw a man closing the back doors to a red Dodge van and another man walking from the van to the house. Fourier contacted the two men, defendants Chapman and Leyva. He recognized Leyva from previous contacts and knew that he had past involvement in narcotic offenses.

Officer Harris and Sergeant Haag arrived. Harris walked around the van and, as he passed the open driver's window, smelled a strong odor of methamphetamine coming from the van. The back door of the house was open, and Harris could see two fans inside the house, exhausting air out the door. The air being blown out carried a strong odor of methamphetamine. Harris saw a .22 caliber rifle leaning against the wall inside the doorway. He picked it up, unloaded it and replaced it. He then heard a "thumping noise" coming from the second story of the house.

Harris told Fourier that he could smell the odor of methamphetamine coming from the house. Harris looked in the van window and saw a metal steamer trunk and white plastic bucket-type containers. He had seen similar items used to store chemicals and glassware during his investigations of methamphetamine labs. Fourier advised Chapman and Leyva of their *Miranda* rights. They denied ownership of the van until Harris started to check it, at which time Chapman said that the van was his. Harris opened the van doors, found several plastic bags and smelled methamphetamine. Because someone had mentioned a third person, Harris asked where the "third guy" was and was told that he had "gone to the store." The officers handcuffed Chapman and Leyva and put them in patrol cars.

Approximately 15 minutes had elapsed since the officers had arrived at the house. Harris walked to the door a second time. He testified that the odor got stronger as he approached the house. Because of the fans, the strong odor of methamphetamine and the "thumping noise," Harris believed that there was a possibility of a "working methamphetamine lab" inside the house and that the third person was in the house. The officers then moved back passers-by who had congregated at the scene and blocked off the streets with their patrol cars. Using their radios and the mobile telephone in Haag's car, they called for additional reserve police, notified an Oregon City Police Department detective, the Clackamas County Sheriff's Office and the Oregon City Fire Department, which sent a fire truck. They also contacted the City of Gresham/Multnomah County Hazardous Materials Response Team (Haz-Mat), which is a unit of specialists trained to respond to chemical emergencies.

When the detective arrived, he, Haag and Harris conferred and decided that police should enter the house to determine if there was, in fact, a working lab inside. Using air packs from the fire engine, Fourier and Harris entered the house. The entry took place about 45 minutes after they had first arrived. In a ground floor bedroom, they saw weapons and, in the kitchen, they saw tin foil, which is used in the manufacture of methamphetamine. On the stairwell, they found more plastic buckets and other containers, which appeared to contain chemicals. On the second floor, they entered a room, the windows of which had been boarded on the inside with plywood and found equipment that Fourier recognized as paraphernalia used for marijuana cultivation. They found defendant Sundeen in the room. Eventually, the officers determined that there was no working lab in the house.

The officers had made no attempt to obtain a telephonic search warrant before their entry into the house. After their entry into the house, they drafted an affidavit, which took about two to three hours. It was Sunday afternoon, and they had difficulty in locating a judge; it was after 3:00 p.m. when a search warrant was issued and they reentered the house. Harris explained that he had entered the house the first time without a warrant because,

"[g]iven the potential danger that existed, they have told us in training and so on that these methamphetamine labs can take out a whole city block or bigger depending on the size of the lab. At this point the thought that that was a working lab, given it was in a residential area, given the danger it presented, I thought sufficiently overrode the need to wait to get a warrant due to possible explosion."

At the suppression hearing, the officers testified about their training and experience in recognizing the odor of methamphetamine and in the investigation of methamphetamine labs.[1] Gresham Fire Department Inspector Jolly had arrived after the officers had entered the house. He testified that he had had calls involving at least 100 clandestine methamphetamine labs while heading the Haz-Mat team. He testified about the dangers of the chemicals used and the method of production:[2]

"Q. Let's talk about when you respond to a situation where you know there is a clandestine laboratory. How important is it for you to determine whether or not that laboratory is operating or functional?

---

[1] Fourier had been an Oregon City police officer for over eight years and had spent nine months on the Clackamas Law Enforcement Undercover Team, which included training regarding drugs. He had attended a conference in which officers were made familiar with odors of chemicals used in methamphetamine production. He had smelled methamphetamine on five or six previous occasions.

Harris had been in law enforcement since 1969. He had attended training conferences concerning methamphetamine labs, including detection by odor, what equipment was used and the danger of the chemicals employed. He had been involved in three methamphetamine lab investigations and testified, "Once you smell [methamphetamine], you never forget it."

Haag had been an Oregon City police officer since 1983. He had had academy training concerning drugs and had attended a class on clandestine labs. Two other officers on the scene also testified. Deputy Poppen had been involved in 20 to 30 methamphetamine investigations, and Detective Erickson had had training regarding drug labs and had been involved in investigations of fewer than five actual labs.

[2] Jolly testified that the National Fire Protection Association health and fire hazard rating system is 0 to 4, with 4 being the most dangerous. He testified that a clandestine methamphetamine lab is always treated as a 3, which identifies "materials which are extremely hazardous to health, but areas may be entered with extreme care." He testified that sometimes a methamphetamine lab is treated as a 4 situation "[w]hen we have sketchy information from people as to the content or what's inside the building." Jolly also stated that a methamphetamine lab is a 3 or 4 range as to fire hazard, depending on whether there is a presence of volatile, flammable liquids or volatile gasses, such as ether or hydrogen. On a comparable scale for reactivity, he described methamphetamine labs as on a 2-3 scale, because of the use of "exotic metals" such as magnesium and sodium. He testified that when sodium is exposed to water, "it goes 'boom.' "

"A. That's basically our first question when we're asked to respond. If it's operating, that means that there is heat; there is definitely a chemical reaction going on. It is producing flammable vapors. It's producing poisonous gases, and it is — in almost — it's in an uncontrolled atmosphere, and you've got all this going on in a residential area.

"Q. Is it important to make an immediate determination or can you wait ten or twelve hours?

"A. No. *You need to get right in and find out what's going on. You need to have somebody get in to see exactly what is happening in there, to find out if it is, in fact, operating.* We respond if we have an operating lab what we call a code 3, red lights and siren, just as we would to any type of emergency. We consider an operating meth lab an emergency and our first priority is to stabilize it.

"Q. In this particular case you had information that it wasn't an operating lab; is that correct?

"A. That's correct.

"Q. And eventually your team executed the warrant in this house?

"A. I can't say we executed the warrant.

"Q. Well, let me ask the question a different way. Your team didn't go in until a warrant was secured; is that correct?

"A. Right.

"Q. Are there situations where you go in immediately?

"A. Yes.

"Q. In what kind of situations?

"A. *We go in with a lab that's cooking. We feel that the risks of fire and explosion and risk to the neighborhood surrounding the lab are great enough that we need to get in and get the situation controlled immediately.*" (Emphasis supplied.)

In granting defendants' motions to suppress, the trial court found, *inter alia,* that the officers had probable cause to believe that there was a methamphetamine lab in the house and that the operation of a lab is a "potentially and extremely hazardous event which can cause death and danger from fumes, fire, and explosion,"· but that there was no evidence that the officers feared that evidence was being destroyed and that there were no exigent circumstances

justifying the warrantless search of the house. It made no findings as to whether the facts established probable cause to believe that a lab was then operating.[3]

The state argues that the trial court erred in suppressing the evidence. It urges us to recognize a rule that a clandestine, operating methamphetamine lab constitutes an exigent circumstance *per se*.[4] The state argues that laboratories present substantial risks of explosion and fire or, at a minimum, present health hazards due to the toxic and carcinogenic properties of the chemicals used in methamphetamine production. The state argues that the rule would be consistent with the *per se* exigency rule, recognized in *State v. Brown,* 301 Or 268, 721 P2d 1357 (1986), for searches of mobile vehicles. Defendants' position is that the analogy is invalid, because the "exigency" found in *Brown* was based on the rationale that the mobility of a vehicle constitutes an immediate risk that evidence in the vehicle could be destroyed or removed. Defendants are correct in their assertion that the rule in *Brown* comes within the well-delineated exception to the warrant requirement preventing the destruction of evidence. However, exigent circumstances may also exist when there is a threat of immediate danger to life or property. *See State v. Girard,* 276 Or 511, 514 n 2, 555 P2d 445 (1976); *State v. Heikkinen, supra,* n 3, 94 Or App at 475.

---

[3] The trial court stated:

"Based on the unlawful entry of the officers into the house, I'm going to order that statements of Mr. Sundeen be suppressed. I will point out to all parties [*State v. Heikkinen,* 94 Or App 472, 476 n 3, 765 P2d 1252 (1988),] and I quote, 'Because we hold that exigent circumstances arose from the possible destruction of evidence, we need not address the state's second claimed exigency that it was necessary to enter to prevent the laboratory from exploding or emitting toxic fumes.' This issue has not been decided by the appellate courts. It's my feeling that it's a matter that should be decided by the appellate courts, not by the trial court.

"I have tried to make specific findings inviting the state to appeal my ruling, specifically if meth labs in and of themselves are dangerous. There is not an exception at this time in the State of Oregon. If there is an exception, it would substantially change the way that searches are conducted in the State of Oregon.

"As I said, it's the responsibility of the appellate courts or the legislature."

[4] The state bases its argument on Jolly's testimony, which, it claims, is "consistent with [the facts] that have been found by other courts and that appear with regularity in news reports." We need not go outside the record to determine the dangers of a working lab.

In *State v. Heikkinen, supra* n 3, investigating officers, acting on information provided by a woman who was under the influence of methamphetamine, were confronted with the odor of methamphetamine when the door to a house was opened. We did not decide whether the probability of a working methamphetamine lab presented exigent circumstances, because the sound of a flushing toilet presented exigent circumstances, that is, the possible destruction of evidence. However, the special concurrence of Riggs, J., noted that the "greater exigency [is] posed by the operation of this type of clandestine drug laboratory in a residential neighborhood." 94 Or App at 476. The hazards of fire and explosion outlined in that special concurrence were reiterated here by Jolly.

■ Defendants do not dispute that, during the actual production of methamphetamine, there is a chemical reaction that presents a danger to the public. We conclude that a working methamphetamine lab in an environment that poses a threat of immediate harm to life and property, presents exigent circumstances justifying entry without a warrant. Although the parties term that recognition as a "per se rule" of exigency, we do not accept that characterization. The fact established by expert testimony in this case and others, *see State v. Heikkinen, supra,* 94 Or App at 476, and, indeed, conceded by defendants, is that a working methamphetamine lab requires that action be taken as quickly as possible. That recognition does not create "exigency" any more than does recognizing other conditions that are inherently dangerous.

■ The parties' emphasis on a "per se" rule skews the focus of the inquiry. What must be determined is not that the condition is dangerous but, rather, whether the dangerous condition exists. Thus, to justify a search without a warrant, the police will have to have probable cause to believe that there is a working methamphetamine lab in a community environment. They must be able to articulate particular facts establishing why they concluded that there was probably a working methamphetamine lab at the specific location, that the location of that lab immediately endangered the surrounding community, not just the operators of the lab,[5] that,

---

[5] For example, an operating methamphetamine lab situated in a rural location, miles from another neighbor, presents little danger to the public in terms of

consistently with public and personal safety, their entry took place as promptly after discovery as possible and that the search was not more intrusive than was necessary.

Defendants argue that the police should not be excused in this case from the warrant requirement. There exists a statutory procedure to obtain a telephonic warrant, *see* ORS 133.545(5), and defendants argue that, unless the state shows that the police tried to obtain a warrant but were unable to do so, there can be no true exigency. They point out that the evidence shows that the officers made no effort to obtain a telephonic warrant[6] and that, indeed, there was no policy in place in Clackamas County to implement the telephonic warrant procedure. They contend that the police chose, for their own convenience, not to try to obtain a warrant and that convenience alone does not create a practical necessity to justify a warrantless entry. *See State v. Saunders,* 103 Or App 488, 494, 799 P2d 159 (1990).

Defendants rely on *State v. Rubert,* 46 Or App 843, 612 P2d 771 (1980), and *State v. Roberts,* 75 Or App 292, 706 P2d 564 (1985), for the proposition that the state must prove that a warrant could not be obtained. However, those cases did not involve findings that exigent circumstances existed.[7] Here, we hold that a working methamphetamine lab is an exigent circumstance. Although all law enforcement authorities should have a policy regarding telephonic warrants, that failure does not change the rule that, when probable cause and exigent circumstances exist, a warrant need not be obtained.

---

immediate explosion and contamination before a warrant could be obtained.

[6] The record does not show that, during the 45 minutes between their arrival and the entry into the house, the officers' time was unoccupied. They were involved in securing the neighborhood, in obtaining assistance and in questioning defendants.

[7] In *State v. Roberts, supra,* the police entered the defendant's residence to effect an arrest after they had been informed of circumstances indicating that he had been driving while intoxicated. We held that there was no medical emergency regarding the defendant's health and that the warrantless entry could be justified by the need to test for blood alcohol only on a showing that a warrant could not be obtained before alcohol dissipation. Here, all parties agree that the heating process used in methamphetamine creates the danger of explosion; we find no meaningful analogy to the time required to get a warrant before blood alcohol dissipates and the immediate possibility of an explosion in a clandestine lab.

Defendants also argue that the facts here do not support a finding of exigent circumstances, primarily because the odor of methamphetamine can linger and, therefore, the officers could not rely on the odor to indicate a working lab. Defendants also contend that other evidence, such as buckets in the van and fans used to blow air from the house, suggests that any methamphetamine operation had ended. They argue that the facts should be read consistently with the trial court's conclusion that no exigent circumstances existed.

The findings are ambiguous as to the crucial fact of whether there was probable cause to believe that there was an operating lab. The trial court stated:

"I find that the officers had probable cause to believe that there was a methamphetamine operation in the house and that Mr. Leyva and Mr. Chapman were involved in that operation. This was based on the information from the Harmons that they saw Mr. Leyva and Mr. Chapman going from the house to the van, and also based on the information from the police officers that they saw one of those defendants closing the van door. It is also based on the odor of methamphetamines that came from the van and from the house.

"I find that the operation of the methamphetamine lab is a potentially and extremely hazardous event which can cause death and danger from fumes, fire, and explosion.

"There is no evidence before me on which I can find the police had any expectation or fear of the destruction of evidence. I find that the actions of Harris in removing and unloading the rifle was proper and necessary for the officers' safety.

"Having so found, I find that the officers lacked exigent circumstances to search the van. I find that the officers lacked exigent circumstances to search the house."

The court made no findings as to whether the police had probable cause to believe that there was a working lab, *i.e.,* that methamphetamine was being manufactured and chemical reactions were taking place. In the light of our holding, we remand to the trial court to make findings on that issue and for further proceedings not inconsistent with this opinion. *See State v. Davis,* 99 Or App 358, 781 P2d 1264 (1989), *rev allowed* 310 Or 70 (1990); *State v. Rivas,* 99 Or App 23, 29, 781 P2d 364 (1989), mod 100 Or App 620, 788 P2d 464, *rev den* 310 Or 122 (1990).

The state makes no separate argument regarding the suppression of evidence taken from the van. We affirm that portion of the order.

Affirmed as to suppression of evidence from van; reversed as to suppression of evidence seized from house; remanded.

**BUTTLER, P. J.,** concurring in part; dissenting in part.

I agree that the record supports the trial court's finding that an operating methamphetamine lab is hazardous and that, if it is located in a residential area, exigent circumstances exist that would permit entry without a warrant, *if* the officers have probable cause to believe that there is then an operating methamphetamine lab in the house. I am hesitant, however, to adopt what amounts to a *per se* rule; I do not know whether that rule confirms a universal truth. The record in this case might be completely accurate but, again, it might not be. Accordingly, I would limit our holding to the record in this case and leave it to the legislature to determine, after hearings, the truth of the matter. If it finds that operating methamphetamine labs are as hazardous as this record indicates, posing a threat of immediate danger to life or property sufficient to justify a warrantless entry by the police, it may pass a law to deal with that problem.

The question remains whether the officers had probable cause to believe that a methamphetamine lab was *in operation* in the house when they entered. As the majority notes, the trial judge did not find that the officers had probable cause to believe that and remands the case to permit the trial court to make a finding on that question. Because I do not believe that the record supports a finding of probable cause, I would affirm, rather than remand. The record shows that some neighbors observed a van back into the house's driveway and then saw two men going back and forth between the open rear of the van to the opened door of the house. They concluded that there was possibly a burglary in progress and called the police.

When Officers Harris and Haag arrived, Harris walked around the van, smelled a strong odor of methamphetamine coming from it and saw through the van window a metal steamer trunk and white plastic bucket-type

containers, which he recognized as being similar to those used to store chemicals and glassware for use in the manufacture of methamphetamine. After Harris opened the van doors, found several plastic bags and smelled the odor of methamphetamine, he had probable cause to arrest Chapman and Leyva for possession of a controlled substance. The exhaustion of fumes from the house smelling strongly of methamphetamine gave rise to no more than a strong suspicion that activity involving methamphetamine had been or was being engaged in within the house. However, a suspicion, no matter how well founded, does not give rise to probable cause. The most that the officers testified to was that there was "a possibility" that there was a lab operating in the house and that they thought they should go in and "find out" if there was one.

In short, the evidence supports a finding of probable cause to believe that something to do with methamphetamine was going on in the house. The officers could have obtained a search warrant but made no effort to do so during the 45 minutes between their arrival at the scene and their entry. However, the presence of methamphetamine or paraphernalia used to manufacture it in a house is not, as such, the hazard addressed by this record to support a finding of exigent circumstances justifying the warrantless search.

By remanding, the majority presumably agrees that the officers' smelling of fumes being exhausted from the house is sufficient to support probable cause to believe that there was a lab *in operation* inside. I do not believe that that is sufficient to support probable cause to search for an *operating* lab, which is the crux of the argument, to support the existence of exigent circumstances.