WELCH, Judge.
Patricia Williams was convicted of unlawful possession of a controlled substance, a violation of § 13A-12-212, Ala. Code 1975; unlawful manufacture of a controlled substance, a violation of § 13A-12-218, Ala.Code 1975; and trafficking in methamphetamine, a violation of § 13A-12-231, Ala.Code 1975.
Williams was sentenced as a habitual felony offender to 15 years’ imprisonment for unlawful possession of a controlled substance, was fined $2,500 for that offense, and was ordered to pay a $2,000 assessment pursuant to the Drug Demand Reduction Assessment Act (“DDRAA”). She was also ordered to pay a $2,500 crime-victim assessment and a $100 assessment to the forensic trust fund.
As to her convictions for unlawful manufacture of a controlled substance and trafficking, Williams was sentenced to life in prison for each conviction, the sentences to run concurrently. The trial court also fined Williams $50,000 for each offense, and ordered an additional $2,500 crime-victim assessment and $100 forensic trust-fund assessment for each offense. A $2,000 DDRAA assessment also was imposed for Williams’s trafficking conviction. We note that the DDRAA does not authorize an additional penalty upon conviction of the unlawful manufacture of a controlled substance. § 13A-12-281(a), Ala.Code 1975, and Hollaway v. State, 979 So.2d 839 (Ala.Crim.App.2007).
The only issue Williams raises on appeal is whether the search of her mobile home by law-enforcement officials constituted an unlawful warrantless search. The evidence elicited during the hearing on whether evidence obtained during that search was due to be suppressed tended to show the following.
On May 5, 2005, investigators with the Houston County Sheriffs Department received information from a confidential informant — whose information had proven reliable on previous occasions — that a methamphetamine lab was being operated at a specific address on Iris Road in Houston County. The investigators and members of the Dothan Police Department went to the address to verify the information and to conduct what is known as a “knock and talk” with anyone at the location. (R. 55.)
Adam Robinson, who at the time of Williams’s arrest was with the Houston County Sheriffs Department and who at the time of trial was an officer with the Dothan Police Department, testified that when law-enforcement officials arrived at the location, they saw a trailer and a shed about five feet behind the mobile home. Two men were standing near the shed, and the door to the shed was open.
*917 Robinson said he went to the shed at the same time other officers went to secure the mobile home. He said a chemical odor that he associated with the manufacture of methamphetamine was emanating from the shed. He also said that when he looked inside the shed he could see a vase that contained a boiling liquid and a tube going into the vase. He said that based on his experience, the odor, coupled with what he saw, led him to conclude that a methamphetamine lab was being operated in the shed.
Robinson also testified to the dangers associated with the operation of methamphetamine labs, including explosions if the ingredients being “cooked” are left on the heat, the volatility of the ingredients used in making methamphetamine if care is not taken with them, and the unexpected behavior of people operating the labs and their ability to cause explosions based on the items at hand. For example, Robinson described an instance in which a suspect in a methamphetamine lab hurled a makeshift firebomb at law-enforcement officials who were conducting a search.
Terry Nelson, another Dothan police officer who was an investigator with the Houston County Sheriffs Department at the time of Williams’s arrest, testified that when law-enforcement officials arrived at the Iris Road location, he was among the people who secured the mobile home. He said he had a view inside a window of the mobile home, and he saw someone “stuffing at a plant.” (R. 40.)
Nelson testified that his group met two men at the front door of the mobile home. He said that from the door, one could smell a strong odor of marijuana as well as a strong chemical odor, which, based upon his experience, he knew was associated with a methamphetamine lab. He said that Robinson then came to the front door of the mobile home and told them that methamphetamine was currently being cooked in the shed. At that time, Nelson said, law-enforcement officials believed that a methamphetamine lab was operating inside the mobile home, as well, and they made the decision to enter the mobile home without a warrant and without seeking permission from anyone “to clear the house to make sure no one else was in the residence” and for the officers’ own safety. (R. 42.)
Nelson explained why law-enforcement officials did not ask permission of anyone to search the mobile home:
“Because we smelled the odors, and due to the circumstances, we didn’t know what was going on in the house. We knew that we had an active meth lab outside. We knew we smelled marijuana and chemicals at the front door of that residence. And after Adam [Robinson’s] telling us, we went in to clear the house for our safety, because we’ve been almost blew up in meth labs before.”
(R. 49.)
Nelson found the butts of marijuana cigarettes in an ashtray in one bedroom. One of the bedrooms in the back of the mobile home had a padlock on the door. Nelson said he asked whose bedroom it was, and one of the men he had encountered at the door said it was Williams’s room.
Nelson said no one had a key to the padlock, so officials broke the lock on the door and went inside “to make sure nobody was in there.” (R. 45.) No one was in the room, and Nelson checked the closet. In the closet, he said, was a gallon of acetone. He also found muriatic acid, which he said is used in manufacturing methamphetamine, as well as the finished product itself. Nelson said he learned where Williams was and telephoned her. *918 She arrived at the mobile home within 20 to 30 minutes.
Williams and the men who were present at the mobile home and shed when law-enforcement officials arrived at the Iris Road location were arrested on drug charges.
The evidence presented at the hearing on the motion to suppress was not disputed. “This Court reviews de novo a circuit court’s decision on a motion to suppress evidence when the facts are not in dispute.” State v. Skaggs, 903 So.2d 180, 181 (Ala.Crim.App.2004). “A trial court’s ultimate legal conclusion on a motion to suppress based on a given set of facts is a question of law that is reviewed de novo on appeal.” State v. Hargett, 935 So.2d 1200, 1204 (Ala.Crim.App.2005).
“ ‘All evidence obtained by a search that is conducted in violation of the Constitution of the United States is inadmissible in a state court. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Loyd v. State, 279 Ala., 447, 186 So.2d 731 (1966). The Fourth Amendment to the Constitution of the United States bans all unreasonable searches. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Whether a search is unreasonable depends upon the facts and circumstances of the particular case. Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). Warrantless searches are per se unreasonable unless they fall within a recognized exception. Ex parte Hilley, 484 So.2d 485 (Ala.1985). Those exceptions include: objects in plain view, consensual searches, a search incident to a lawful arrest, hot pursuit or emergency situations, probable cause coupled with exigent circumstances, and a Terry “stop and frisk” situation. Daniels v. State, 290 Ala. 316, 276 So.2d 441 (Ala.1973). Where a search is executed without a warrant, the burden falls upon the State to show that the search falls within an exception. Kinard v. State, 335 So.2d 924 (Ala.1976).’
“Ex parte Tucker, 667 So.2d 1339, 1343 (Ala.1995).”
Bridgett v. State, [Ms. CR-06-1011, November 2, 2007] — So.2d-,-(Ala. Crim.App.2007); see also Rokitski v. State, 715 So.2d 859, 861 (Ala.Crim.App.1997).
For the warrantless search of Williams’s mobile home to be legal, law-enforcement officials had to have not only probable cause to search but also exigent circumstances had to exist to justify the warrant-less entry and search of her home. Cameron v. State, 861 So.2d 1145 (Ala.Crim. App.2003). In her brief on appeal, Williams does not dispute that law-enforcement officials had probable cause to search the mobile home. She argues instead that no exigent circumstances existed that would sustain a warrantless search.
This court has explained what the State must prove to show the existence of exigent circumstances as follows:
“ ‘ “[N]o exigency is created simply because there is probable cause to believe that a serious crime has been committed.” Welsh [v. Wisconsin, 466 U.S. 740, 753, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) ]; Mincey [v. Arizona, 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) ]. “[T]he mere presence of narcotics, without more, is not such an exigent circumstance as would permit entry into private premises without a proper warrant.” People v. Lee, 83 A.D.2d 311, 444 N.Y.S.2d 100, 102-103 (1981), cert. denied, 460 U.S. 1044, 103 S.Ct. 1443, 75 L.Ed.2d 798 (1983). See also People v. Ouellette, 78 Ill.2d 511, 36 Ill.Dec. 666, 669-70, 401 N.E.2d 507, 510-11 (1979). *919 “The presence of contraband without more does not give rise to exigent circumstances.” United States v. Torres, 705 F.2d 1287, 1297 (11th Cir.1983).
“‘There have been various attempts to formulate an all encompassing definition of exigent circumstances. See Harbaugh and Faust, “Knock on Any Door”-Home Arrests After Payton and Steagald, 86 Dick. L.Rev. 191 (1982); Donnino and Girese, Exigent Circumstances For A Warrantless Home Arrest, 45 Alb. L.Rev. 90 (1980); Comment, Warrantless Arrests: Justification By Exigent Circumstances, 6 Hamline L.Rev. 191 (1983); W. LaFave, 2 Search and Seizure § 6.5 (1978). However, “[t]he exigent circumstances doctrine applies only when the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action.” United States v. Satterfield, 743 F.2d [827, 844 (11th Cir.1984)]. The possibility that evidence will be destroyed is an exigent circumstance widely recognized by the courts. Note, Exigent Circumstances for Warrantless Home Arrests, 23 Ariz. L.Rev. 1171, 1177 (1981). “[W]hen police officers have probable cause to search a residence for evidence, and they reasonably believe that such evidence is threatened with loss from any source, they may make a warrantless search of the premises in order to preserve and protect that evidence.” Case note, Residential Searches to Prevent the Destruction of Evidence: An Emerging Exception to the Warrant Requirement, 47 U.Colo. L.Rev. 517, 532 (1976); Comment, Residential Searches to Prevent Destruction of Evidence: A Need for Strict Standards, 70 J.Crim. L. & Crim. 255 (1979); 2 Search § 6.5(b).
“ ‘In finding the existence of exigent circumstances due to the threatened destruction of evidence, the courts have applied such broad tests as the “ ‘great likelihood that the evidence will be destroyed or removed before a warrant can be obtained,’ that the evidence is ‘threatened with imminent removal or destruction,’ or that the police ‘reasonably conclude that the evidence will be destroyed or removed before they can secure a search warrant.’ ” 2 Search at p. 438, § 6.5(b).
“ ‘ “When Government agents, however, have probable cause to believe contraband is present and, in addition, based on the surrounding circumstances or the information at hand, they reasonably conclude that the evidence will be destroyed or removed before they can secure a search warrant, a warrantless search is justified. The emergency circumstances will vary from case to case, and the inherent necessities of the situation at the time must be scrutinized. Circumstances which have seemed relevant to courts include (1) the degree of urgency involved and the amount of time necessary to obtain a warrant, ...; (2) reasonable belief that the contraband is about to be removed, ...; (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought, ...; (4) information indicating the possessors of the contraband are aware that the police are on their trail, ...; and (5) the ready destrueti-bility of the contraband and the knowledge ‘that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.’...” United States v. Rubin, 474 F.2d 262, 268-69 (3rd Cir.1973) (citations omitted). See also 2 Search at pp. 439-450.’
*920 “Youtz v. State, 494 So.2d 189, 193-94 (Ala.Crim.App.1986).”
Cameron, 861 So.2d at 1151-52.
The State contends that the methamphetamine lab itself created an exigent circumstance that enabled law-enforcement officials to conduct a warrantless search of Williams’s mobile home. The appellate courts of Alabama have not previously addressed the narrow issue whether the threat posed by an operating methamphetamine lab constitutes an exigent circumstance allowing a warrantless search of a residence law-enforcement officials suspect contains a methamphetamine lab.
Jurisdictions that have tackled the issue have held that the dangers posed by an operating methamphetamine lab are sufficient to constitute an exigent circumstance for purposes of conducting a warrantless search of a residence. For example, in United States v. Layne, 324 F.3d 464, 468-69 (6th Cir.2003), the United States Court of Appeals for the Sixth Circuit noted that the production of methamphetamine “ ‘poses serious dangers to both human life and to the environment ... [and] these chemicals and substances are utilized in a manufacturing process that is unstable, volatile, and highly combustible. Even small amounts of these chemicals, when mixed improperly, can cause explosions and fires.’ ” Id., quoting H.R. Rep. 106-878, pt. 1 at *22 (September 21, 2000).
The Maine Supreme Court also has held that discovery of an operating methamphetamine lab can provide an exigent circumstance that would allow a warrantless search. State v. Bilynsky, 932 A.2d 1169 (Me.2007). In its opinion, the Maine court included a catalog of those jurisdictions that have held that discovery of an operating methamphetamine lab constitutes an exigent circumstance, beginning with United States v. Williams, 431 F.3d 1115 (8th Cir.2005), in which the United States Court of Appeals for the Eighth Circuit held that the discovery of an operating methamphetamine lab in the defendant’s home rendered a protective sweep of the home necessary to protect the safety of the officers and local residents.
The Bilynsky court then cited other cases consistent with Williams, stating that
“the Eighth Circuit noted that ‘[t]he potential hazards of methamphetamine manufacture are well documented, and numerous cases have upheld limited warrantless searches by police officers who had probable cause to believe they had uncovered an ongoing methamphetamine manufacturing operation.’ United States v. Walsh, 299 F.3d 729, 734 (8th Cir.2002). The court cited five cases [in Walsh ] from the Ninth and Tenth Circuits to support that proposition. Id. Courts outside the Eighth, Ninth, and Tenth Circuits have reached the same result. See, e.g., United States v. Denson, No. 1:05-CR-088 ... (E.D.Tenn. Feb.2, 2006); People v. Duncan, 42 Cal.3d 91, 227 Cal.Rptr. 654, 720 P.2d 2, 10-11 (1986); Holder v. State, 847 N.E.2d 930, 939-40 (Ind.2006); State v. Castile, No. M200<F-02572-CCA-R3-CD ... (Tenn.Crim.App. June 28, 2006).”
State v. Bilynsky, 932 A.2d 1169, 1175-76 (Me.2007).
The Iowa Supreme Court has found that “[t]he volatile nature of the dangers created by methamphetamine labs can be exigent circumstances justifying an immediate limited search of premises harboring such a lab.” State v. Simmons, 714 N.W.2d 264, 273 (Iowa 2006); see also Kleinholz v. United States, 339 F.3d 674, 677 (8th Cir.2003) (explaining that the volatile nature of methamphetamine labs *921 presents exigent circumstances justifying an immediate limited search when officers smelled odor associated with the production of methamphetamine); and State v. Chapman, 107 Or.App. 325, 332-33, 813 P.2d 557, 560-61 (1991) (concluding that a working methamphetamine lab provided exigent circumstances for warrantless search).
Based on the inherent dangers of an operating methamphetamine lab, we now hold that discovery of such a lab by law-enforcement officials constitutes an exigent circumstance justifying a warrantless search. Here, law-enforcement officials were investigating a tip from a confidential informant that a methamphetamine lab was being operated at a certain location. Upon arriving at that location, the investigators smelled odors associated with a methamphetamine lab in a shed and emanating from Williams’s mobile home. One of the investigators saw an ongoing “cook” of methamphetamine in the shed. Under these circumstances, the law-enforcement officials acted properly in entering the mobile home and searching it room by room to clear it. Therefore, the trial court properly denied Williams’s motion to suppress evidence seized during the search of the mobile home.
For the reasons set forth above, the judgment of the trial court is due to be affirmed.
AFFIRMED.
BASCHAB, P.J., and McMILLAN, SHAW, and WISE, JJ., concur.