STATE of Maine

v.

**William BERKLEY a/k/a William Berkley Strong.**

Supreme Judicial Court of Maine.

Argued Nov. 2, 1989.
Decided Dec. 11, 1989.

James E. Tierney, Atty. Gen., Garry L. Greene (orally), Asst. Atty. Gen., Augusta, for plaintiff.

Wayne P. Libhart (orally), Ellsworth, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD, HORNBY and COLLINS, JJ.

WATHEN, Justice.

Defendant William Berkley appeals from his conviction of arson to collect insurance proceeds, 17–A M.R.S.A. § 802(1)(B)(1) (Supp.1988), following a jury trial in Superior Court (Hancock County, *Alexander, J.*). Defendant argues on appeal that both the prosecution's pre-indictment delay, as well as the admission of the results of the analysis of soil samples taken by defendant's insurer's agent as part of the insurer's investigation of the fire, violated his right to due process under the Maine and United States Constitutions. Defendant further contends that the admission of the analysis of soil samples violated M.R. Crim.P. 16(d). Finally, defendant argues that the trial justice committed reversible error in making several rulings at trial. We affirm the Superior Court.

Defendant owned a large log structure on the south shore of Tunk Lake in Hancock County known as "the Wickyup" or "the Admiral Byrd Property." Defendant purchased the property, along with approximately fifty surrounding acres, from Richard E. Byrd, Jr. in April, 1983. Wickyup was the only asset of Chimney Market Corporation, a development business of which defendant was the sole officer and shareholder. Defendant planned to use Wickyup as a summer residence and develop condominiums on the surrounding lake shore land. Soon after defendant purchased the property, however, certain Byrd family members obtained a court order enjoining him from proceeding with his development plans.[1] On July 11, 1984, defendant obtained a binder effective for thirty days insuring Wickyup for $824,000 through Commercial Union Insurance Company (Commercial Union). On July 17, 1984, the building was completely destroyed by fire.

State fire investigator John Morse visited the scene on the day of the fire. He approached defendant and asked him to sign a consent to search the property, but defendant refused, explaining that he wished to consult with his attorney. The next day defendant signed the consent and was questioned by Morse concerning the cause of the fire. Defendant claimed that he arrived at Wickyup with his watchdog at 7:45 a.m. on the morning of July 17. After lighting a kerosene lamp and placing it on a table in the dining room, defendant went into the kitchen and began to prepare coffee. When he returned to the dining room, the kerosene lamp was on the floor and a fire was started. Defendant hypothesized that his dog must have knocked over the lamp.

On July 21, representatives from First Security Services Corporation (First Security), a private investigation firm retained by Commercial Union, took four soil samples. The samples were sent to an analytical chemist who concluded that three of the four contained a detectable amount of motor gasoline.

On June 17, 1985, defendant was indicted for two counts of arson. The State's case was based on the chemist's analysis of the soil samples, defendant's statements made to Morse, two statements under oath made by defendant to Commercial Union as required by the contract of insurance, and the testimony of Morse, insurance investigators, firefighters, defendant's caretaker, and others. The State's theory was that defendant intentionally started the fire by means of an accelerant.

Defendant moved to dismiss because of pre-indictment delay. After a hearing, defendant's motion was denied. On April 17, 1986, defendant moved for production of the samples pursuant to M.R.Crim.P. 16(b)(2). The State, however, was unable to comply with defendant's request because the samples, which had been kept in First Security's vault, were discarded by First Security personnel shortly before defendant moved for their discovery. Both sides agree that at the time defendant made his discovery request the integrity of the samples was destroyed because the samples had been stored in metal containers that had rusted out. Prior to trial,

---

1. This litigation involved the future of Wickyup and was ultimately resolved in favor of defendant. However, the order halting defendant's development plans was in effect on July 17, 1984, the date of the fire.

defendant moved to suppress the evidence obtained from the soil samples and his motion was denied. A jury trial resulted in defendant's conviction and he now appeals.

## I.

Defendant argues that his ability to mount an effective defense was substantially impaired by the prosecution's delay in bringing the indictment and that this constituted a violation of his right to due process under the Maine and United States Constitutions. Specifically, defendant contends that he was denied the opportunity to test independently the soil samples taken by First Security, that he had no reason to think that he should be taking his own soil samples to aid in his criminal defense, and that even if he had taken such samples they would have been of dubious evidentiary value to him.[2]

The prosecutor's discretion in this area is wide. In deciding due process challenges based on pre-indictment delay, this Court has embraced the restrictive standard articulated by the United States Supreme Court in *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). In *State v. Hutchins*, 433 A.2d 419 (Me.1981), we held that "[b]efore the prosecution is under any obligation to come forward with evidence explaining its delay, the burden is on the defendant to make out a prima facie case of actual and unjustifiable prejudice," and that even when this initial burden is met, "[t]he ultimate burden of persuasion remains with the defendant[.]" *Id.* at 423. *See also State v. Chapman*, 496 A.2d 297, 301 (Me.1985). Moreover, regarding the State's burden of explanation, we explained that "prosecutors are not constitutionally obligated to file charges the moment they have assembled evidence of guil[t]," and that a prosecutor " 'abides by [standards of fair play and decency] if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt.' " *Id.* at 422.

■ Defendant has failed to show that he suffered actual and undeniable prejudice as a result of the delay. With respect to his ability to conduct independent tests on the First Security samples, his own expert testified that rusting of the containers would have resulted in a loss of sample integrity in two months. Even after he was indicted, defendant waited a full ten months before he made his discovery request. Regarding his lack of knowledge that he was under suspicion, defendant acknowledges that he initially refused to sign a consent to have the state fire inspector search the premises until he had consulted his attorney; further, the fire inspector testified that while at the scene on July 21 he met a Mike Bliss who showed him a note (apparently written by defendant's caretaker or the caretaker's wife) instructing him to observe the investigators and record where samples were taken. Finally, the presence of Mike Bliss at the scene at the time First Security collected the soil samples shows that defendant could have taken his own samples from the same locations.

## II.

■ Defendant next asserts that the admission of the test results of the First Security samples violated his right to due process under the Maine and United States Constitutions. Defendant's theory is that the samples were actually exculpatory and that under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny even good faith failure to preserve discoverable evidence results in a violation of due process.

In *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the United States Supreme Court addressed the scope of "the government's duty to take affirmative steps to preserve evidence on behalf of criminal defendants." *Id.* at 486. The Court established a two-part test for determining whether a good faith failure to preserve evidence violates a defendant's right to due process. First,

---

**2.** Defendant argues that in the event he had produced his own test results on his own soil samples showing no evidence of accelerants, the prosecution would simply have said: "that is because the gasoline was spilled where we took our samples, not where you took yours."

the evidence must "possess an exculpatory value that was apparent before the evidence was destroyed;" and second, the evidence must "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489.

Applying the *Trombetta* test on this record, defendant has satisfied neither prong. The fact that defendant's expert disagreed with the State's expert regarding the correct interpretation of the gas chromatographs made from the samples, without more, does not establish that the samples possessed an exculpatory value that was apparent before the evidence was destroyed. With regard to the second prong of the *Trombetta* test, the record supports the conclusion that defendant had the ability to obtain comparable evidence of his innocence. As indicated above, the State provided defendant with the gas chromatographs made from the First Security samples and his expert did in fact use them at trial in an effort to establish defendant's innocence. Further, defendant's expert testified that the methodology employed by the State's expert in making the chromatographs was unsound and that as a result the utility of the chromatographs was doubtful. Finally, as mentioned earlier, defendant had ample opportunity to take his own samples.

Our analysis is consistent with *Arizona v. Youngblood*, —— U.S. ——, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In that case, the United States Supreme Court further narrowed the circumstances under which nonpreservation of evidence will be found unconstitutional. Faced with a due process challenge based on the negligent failure of police to preserve semen samples that might have proved helpful to the defendant in a child molestation case, the Court held "that unless a criminal defendant can show bad faith [3] on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 109 S.Ct. 333, 337. Accordingly, under *Trombetta* and *Youngblood* defendant has failed to establish a violation of his right to due process.

### III.

■ Defendant next contends that the motion justice abused his discretion in refusing to suppress the test results of the First Security samples pursuant to M.R. Crim.P. 16(d).[4] The Superior Court's order reads in relevant part as follows:

> Here, the State intends to use the results of chemical tests of soil samples taken and tested by the insurance company. A report of those test results has been made available to the defense. However, the formal request to the State to provide those materials was not made until too late, after the materials had been either contaminated or destroyed. Further, it does not appear that the soil samples were ever within the control of the State as that term is addressed in Rule 16(b)(1).

Defendant argues that: (1) there is no timeliness requirement in M.R.Crim.P. 16(b) and therefore his request for the samples was not "too late"; (2) the State's use of the insurance company investigation process is merely a subterfuge to avoid the

---

3. An affirmative showing by defendant that the State colluded with the insurer or the insurer's agent to prevent defendant from performing independent tests would make this a different case. While direct proof of such conduct would no doubt be difficult to obtain, defendant has produced no circumstantial evidence of bad faith on the part of the police.

4. M.R.Crim.P. 16 provides in relevant part:
   (b)(1) *Duty of the Attorney for the State.* Upon the defendant's written request, the attorney for the state ... shall allow access at any reasonable time to [tangible things] which are within the attorney for the state's

possession or control.... In affording this access, the attorney for the state shall allow the defendant at any reasonable time and in any reasonable manner to inspect, photograph, copy, or have reasonable tests made.

....
   (d) *Sanctions for Noncompliance.* If the attorney for the state fails to comply with this rule, the court on motion of the defendant or on its own motion may take appropriate action, which may include ... prohibiting the attorney for the state from introducing specified evidence and dismissing charges with prejudice.

formal strictures of criminal procedure and therefore the samples should be regarded as "within the control of the State"; and (3) *State v. Dionne*, 505 A.2d 1321 (Me. 1986), does not control this question.

Contrary to defendant's assertion, *Dionne* is controlling. In that case, the defendant sought suppression of expert testimony concerning analysis of charred material removed by fire investigators from the defendant's cottage. Although the defendant "early on requested that the samples of charred material be preserved to allow independent tests to be made[,]" the samples were inadvertently destroyed. *Id.* at 1324. In upholding the Superior Court's refusal to suppress the testimony, we recognized the motion justice's "broad discretion to decide what sanction, if any, should be imposed for a violation of rule 16." *Id.* (citation omitted). Moreover, we cited with approval the factors relied upon by the Superior Court in arriving at its decision:

The samples destroyed in this case were not unique as the gutted cottage remained full of similar charred material. Defendant had continuous access to the cottage and possessed sufficient expertise regarding fire investigations to appreciate the importance of obtaining and testing charred material. The absence of the tested samples did not preclude defendant from impeaching either the methods used by the State's expert or the conclusions drawn from the test results.

*Id.*

Applying the above criteria to the facts of this case, the motion justice did not abuse his discretion in refusing to suppress the samples. Noting the presence of Mike Bliss, who observed the investigators taking the samples, the motion justice correctly pointed out that there was nothing to preclude defendant from taking independent samples shortly after the fire. Further, defendant's conduct in refusing to sign the consent to search and the dispatching of Bliss to the scene for the purpose of observing where the samples were taken indicate an awareness on defendant's part of the importance of the samples as evi-

dence. Finally, the State did in fact make the gas chromatographs available for use by defendant's expert and defendant's expert attempted to impeach both the methodology employed by the State's expert in creating the chromatographs as well as the conclusions reached by the State's expert in interpreting them.

## IV.

In attempting to explain why three fire investigators called as State's witnesses had differing opinions respecting the point of origin of the fire, the prosecutor made the following statement in his closing argument to the jury:

But you have to understand, look where they're all looking at: the northeasterly part of the west wing. Nobody ever said that was a single-point-of-origin-fire. Wasn't an electrical toaster malfunction. Whole theory here is there was enough accelerant for—to keep in the house for a year if it had an oil burner.

Further along in his argument, the prosecutor commented on defendant's explanation of how the fire started:

Now, you know what the Defendant's version of how the fire started was. It's based on three sources before you: his statement to Peter Dodge on July 17, 1984, his statement to John Morse on July 17, 1984, and his statement under oath to Alan Reisch of Commercial Union on August 16, 1984. And you heard Miss Majeski read his statement under oath of 1984 to you during this trial, and that contains the Defendant's version of how the fire started.

The State says to you the evidence you've heard is contradicted by scientific evidence and common sense. You're allowed to use common sense. So the question is why did the Defendant make up this preposterous story of how the fire started? The dog knocking over the kerosene lamp?

When the prosecutor finished, defendant moved for a mistrial based on, *inter alia*, the prosecutor's statement regarding the

amount of accelerant used to start the fire and the prosecutor's statements concerning the sources of defendant's version of how the fire started. The court denied the motion, explaining as follows:

> With regard to the mistrial motion, the request is denied. I didn't see anything in the Prosecution argument, based on reasonable inferences that could be drawn, plus the ability of the Prosecutor to argue the case, that were beyond the bounds of propriety with regard to closing arguments.
>
> Going backwards to the areas of evidence, again the Prosecutor commented on reasonable inferences from the evidence and can argue on areas of common experience and common sense. I guess the reference to the fuel may be a bit excessive, personally.
>
> . . . .
>
> [B]ut the statement about, you know, enough to heat the place for a year, I think is the type of hyperbole that doesn't lend itself to being believed, therefore is not an issue that is necessary for comment further.

This Court will review the denial of a motion for a mistrial only for an abuse of discretion. *See, e.g., State v. Mason,* 528 A.2d 1259, 1260 (Me.1987) ("The trial court should deny a motion for mistrial except in the rare case when the trial cannot proceed to a fair result and no remedy short of a new trial will satisfy the interests of justice."); *State v. Marr,* 551 A.2d 456, 459 (Me.1988). With respect to the prosecutor's statement regarding the amount of accelerant used, defendant argues that "[t]here was absolutely no evidence adduced at trial that there was any fuel whatsoever brought to Wickyup or left there by defendant or anyone else." With respect to the statements concerning the sources of defendant's version of how the fire started, defendant's argument is that: (1) they im-

properly emphasized defendant's failure to take the stand; and (2) they contained a personal opinion that defendant was lying.

■■■ We hold that the trial justice did not abuse his discretion. Regarding the amount of accelerant, even if the statement went beyond the evidence[5], the trial justice's instructions to the jury adequately cured the transgression.[6] With respect to the statements concerning the sources of defendant's version of events, defendant's suggestion that they improperly reflected on defendant's failure to testify is without merit. They cannot reasonably be seen as a comment, either direct or indirect, on defendant's failure to testify.

Defendant's argument that the prosecutor's remarks contained a personal opinion that defendant lied must also fail. First, defendant has raised this issue for the first time on appeal and is therefore subject to the obvious error standard; and second, when read in context, the prosecutor's remark is a reasonable analysis of the facts in evidence rather than a personal opinion that defendant lied. *State v. Harnish,* 560 A.2d 5, 9–10 (Me.1989); *State v. Smith,* 456 A.2d 16, 17 (Me.1983) (prosecutor may properly attack the defendant's credibility by analyzing the evidence and highlighting absurdities or discrepancies in the defendant's testimony).

■■■ Defendant next argues that the trial justice abused his discretion in refusing to give a specific instruction that it was in fact technically impossible to use a cordless phone to dial out on a multi-party line. During his closing argument, the prosecutor made the following comments:

> Then if you recall his statement under oath read to you, statement of August of '86, says—almost like if you don't believe this, would you believe this: you cannot use a cordless phone on an eight-

---

5. It is not at all clear that it did. Apart from the trial justice's observation that the statement was obvious hyperbole, the State's evidence clearly allows for the inference that a substantial amount of accelerant was used.

6. Both before and after closing arguments the trial justice carefully explained to the jury that argument of counsel during closing arguments was not evidence, and that any discrepancies between statements of counsel and their recollection of the evidence must be resolved in favor of their recollection of the evidence.

party line to call out. You can only use it for incoming calls.

Come on. What is so special about a cordless phone? You plug it in anywhere, can't you? You can plug it into any conventional phone whether an eight-party line or single-party line.

Defendant objected to this statement and moved for a curative instruction.

Reasoning that he had no way of determining whether defendant was correct or not, the trial justice refused to give a specific instruction, deciding instead to allow defense counsel to refute the prosecutor's contention in closing argument and determining to give the previously noted instruction. *See supra* n. 6. Contrary to defendant's assertions, the trial justice correctly perceived that a specific instruction that the cordless phone could not be used to dial out on a multi-party line, even if such a fact could be determined, would have introduced new evidence into the case. Moreover, it appears that the prosecutor's comments were not based on facts not proved, but instead constituted an appeal to the jury to use their common sense in evaluating defendant's statement about the cordless phone. Finally, the trial justice's decision to allow defendant to refute the prosecutor's contention in closing argument, in combination with the curative instruction which the trial justice gave before and after closing arguments, dispelled any prejudice to defendant.

Defendant's final argument is that the trial justice committed obvious error in not declaring a mistrial sua sponte on the basis of improper remarks made by the prosecutor in his rebuttal closing argument. The prosecutor made the following statement:

> For some reason it must be a bad thing for an insurance company to do arson investigations. Well, you know exactly what that attempt is. Nobody likes insurance companies. Big, bad insurance companies. Boo, hiss. Bad, bad, bad, bad. We hate them, but we need them. Everybody has insurance. Insurance company has every right, and the public and you would want them not to pay off

claims of insurance that are the results of the insured committing arson on the property, because we all suffer. All the premiums go up because of this fraud.

Defendant objected to this statement and requested a curative instruction. The trial justice agreed and gave the following curative instruction to the jury:

> [I]n your evaluation of this case in reaching a result, you are not to engage in any personal evaluations, any question of whether there might be impact on you as a result of what you do with regard to the verdict. That should not be something you consider. It's not something that would be appropriate for you to consider, particularly in light of the evidence in this case that would indicate no particular relation to any juror. Consequences of the verdict, impact, personal considerations are not matters you can appropriately consider during the course of your consideration in this matter.

On appeal, defendant argues that the trial justice's curative instruction was "insufficient to cure the harm the State had already done."

While defendant objected to the prosecutor's statement, at no point did he move for mistrial. In such circumstances, "defendant is taken to have acquiesced in the corrective measures adopted by the trial justice, and [the Court will] review only for obvious error." *State v. Gordius*, 544 A.2d 309, 311 (Me.1988). *See also State v. Greene*, 512 A.2d 330, 334 (Me.1986). Under this standard, the conviction will be overturned only if " 'the obviousness of the error and the seriousness of the injustice done to the defendant thereby are so great the Law Court cannot in good conscience let the conviction stand.' " *State v. Boyle*, 560 A.2d 556, 557–8 (Me.1989), quoting *State v. True*, 438 A.2d 460, 469 (Me.1981).

Even though the prosecutor's comment was improper, there was no obvious error in the failure of the trial justice to declare a mistrial sua sponte. "The presiding Justice has considerable discretion in deciding how best to correct a trial error[,]" and " '[o]nly where there are exceptionally prejudicial circumstances or prosecutorial bad faith

will a curative instruction be deemed inadequate to eliminate the prejudice.'" *State v. Nichols*, 495 A.2d 328, 330 (Me.1985), quoting *State v. Hilton*, 431 A.2d 1296, 1302 (Me.1981).

The entry is:

Judgment affirmed.

All concurring.