2005 ME 92

**STATE of Maine**

v.

**Bruce J. KIRBY.**

Supreme Judicial Court of Maine.

Argued: April 26, 2005.
Decided: Aug. 1, 2005.

Mark E. Lawrence, District Attorney, John M. Pluto, Asst. Dist. Atty., Tara K. Bates, Esq., of counsel, Alfred, William R. Stokes, Deputy Atty. Gen. (orally), Augusta, for State.

Stephen Y. Hodsdon, Esq. (orally), Hodsdon & Clifford, LLC, Kennebunk, for defendant.

Panel: SAUFLEY, C.J., and DANA, ALEXANDER,* and LEVY, JJ.*

SAUFLEY, C.J.

[¶ 1] Bruce J. Kirby appeals from a judgment of conviction following a nonjury trial on two charges in the District Court (Biddeford, *Foster, J.*)—one for assault (Class D) 17–A M.R.S.A. § 207(1)(A) (Supp.2004), and one for refusing to submit to arrest (Class D) 17–A M.R.S.A. § 751–A(1)(A) (Supp.2004). Kirby argues that: (1) the deputies' detention of him violated his Fourth Amendment rights; (2) the court erred when it found that Kirby's use

of nondeadly force to resist the deputies' attempt to enter his home was not justified pursuant to 17–A M.R.S.A. § 104 (1983); and (3) the evidence was insufficient to convict him. We affirm the judgment.

## I. BACKGROUND

[¶ 2] On the night of May 7, 2004, the York County Sheriff's Department dispatch received a phone call reporting gunshots in Arundel. A second call came in, this time to the Maine State Police, reporting gunshots in the same area. The second caller identified a neighboring home, the Kirby residence, as the possible site of the gunshots. Neither caller could provide an exact address to identify the location of the gunshots.

[¶ 3] Deputy Danielle Chauvette and Deputy Kevin Ledoux from the York County Sheriff's Department, driving in separate cruisers, found the residence by following the sounds of gunshots, and by identifying the "Kirby" sign on the driveway. As the deputies pulled into the driveway and got out of their cars, they heard a gunshot coming from the backyard, saw a puff of smoke, and observed several people go into the house and turn off the exterior lights. As they approached the house, the lights came back on and one person came back out. He appeared to be intoxicated.

[¶ 4] The deputies observed spent handgun and rifle shell casings on the deck, and also noted that a neighboring home was close enough to be seen through the trees. The deputies also saw two rifles, one an assault rifle, with rounds in or near them, on a table just inside the French doors that opened to the deck. Deputy Chau-

---

* Although not available at oral argument, Justice Alexander participated in this opinion. *See* M.R.App. P. 12(a) (stating that a "qualified justice may participate in a decision even though not present at oral argument").

* Justice Paul L. Rudman sat at oral argument and participated in the initial conference, but retired before this opinion was certified.

vette told the man, later identified as Kirby, why they were there and confirmed that Kirby was the homeowner.

[¶ 5] Although Kirby admitted to firing a handgun, he stated that he had taken it back inside to lock it in a safe. Based on the amount of time that had passed between Kirby's entry and exit from the house, Chauvette did not believe this statement. She told Kirby that he was "not in trouble" in order to calm him down, but she still felt that further investigation of the situation was necessary, later stating, "[i]t was pretty obvious that he was going to be detained until we figured out what was going on and whether or not there was a crime that was committed."

[¶ 6] Kirby told the deputies that he and his guests had been firing guns while standing on his deck, aiming them at the ground. When they asked him for identification, he went to his truck to find his wallet, but it was not there. Kirby then stated that it was in the house and he would go in to get it. The deputies told Kirby that someone inside could bring his identification out to him, but that because he was intoxicated and due to the proximity of the firearms on the table, they did not want him to go back into the house himself unless it was with a police escort. At this point Kirby became upset and shouted profanities, although he made no direct threats. Kirby said he did not want the deputies in his house unless they had a search warrant. After several warnings not to go into the house, Kirby entered the house through the French door.

[¶ 7] Deputy Chauvette then put her knee and arm in the door to prevent Kirby from closing it. Kirby pushed the door against her. Chauvette testified that she was trying to keep Kirby away from the weapons "to keep ... myself ... and Deputy Ledoux safe." Kirby then shoved her in the chest, at which point Ledoux told him, "You are under arrest." A brief struggle ensued, during which Ledoux and Chauvette pulled Kirby back outside and handcuffed him.

[¶ 8] Kirby was charged with assault (Class D) 17–A M.R.S.A. § 207(1)(A), and refusal to submit to arrest (Class D) 17–A M.R.S.A. § 751–A(1)(A). At trial, Kirby asserted the justification of defense of property pursuant to 17–A M.R.S.A. § 104(1), claiming the officers' entry into his home was a criminal trespass to which he had the right to respond with nondeadly force.[1] The court found him guilty on both counts and sentenced him to pay a fine of $250 on each count. This appeal followed. There was no suppression hearing in this matter, and no findings of fact were requested or offered following the trial.

## II. DISCUSSION

[¶ 9] Kirby argues that when the deputies detained him on his back deck for questioning, the detention constituted a seizure without probable cause, in violation of the United States and Maine Constitutions.[2] He asserts that "once it was rea-

---

1. Section 104(1) provides:

   A person in possession or control of premises or a person who is licensed or privileged to be thereon is justified in using nondeadly force upon another when and to the extent that he reasonably believes it necessary to prevent or terminate the commission of a criminal trespass by such other in or upon such premises.

17–A M.R.S.A. § 104(1) (1983).

2. The Fourth Amendment guarantees "[t]he right of the people to be secure ... against unreasonable searches and seizures" without probable cause. U.S. CONST. amend. IV. Similarly, the Maine Constitution provides that law enforcement officers cannot "seize any person ... without probable cause." ME. CONST. art. I, § 5.

sonably clear that [he] had not committed a crime, it was improper for law enforcement officers to continue to detain him" pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

[¶ 10] In the absence of findings of fact, we review the record in its entirety and "assume that the presiding justice found for the prosecution upon all issues of fact necessarily involved in the ultimate decision which was adverse to the Defendant." *State v. Broucher,* 388 A.2d 907, 909 (Me.1978). We review the District Court's application of constitutional concepts to the established facts de novo. *See State v. Reynoso–Hernandez,* 2003 ME 19, ¶ 11, 816 A.2d 826, 830.

[¶ 11] Kirby appears to frame the issue in terms of probable cause.[3] However, contrary to Kirby's assertion, the legality of the deputies' entry into his home does not turn on the question of whether or not they had probable cause to conduct a search or a seizure. Rather, given the limited nature of the deputies' restriction of his movement, they needed only to have had a reasonable, articulable suspicion of criminal activity to justify the detention of Kirby that led to the confrontation at the entrance to his home.

[¶ 12] An officer may approach, detain, and even briefly frisk a person if that officer can articulate reasonable suspicion of criminal activity. In *Terry,* the Supreme Court first defined articulable suspicion when it stated that

the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted

reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

392 U.S. at 27, 88 S.Ct. 1868 (citations omitted). This holding was based in part on the necessity during such an investigation for a police officer, "for the protection of himself and others[,] to take swift measures to discover the true facts and neutralize the threat of harm if it materialize[s]." *Id.* at 30, 88 S.Ct. 1868. After a *Terry* stop has been initiated, the Supreme Court has authorized police "to take such steps as ... reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley,* 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). The Terry analysis has long been adopted and applied in Maine. *See, e.g., State v. Langlois,* 2005 ME 3, ¶ 7, 863 A.2d 913, 916; *State v. Moulton,* 1997 ME 228, ¶ 10, 704 A.2d 361, 364; *State v. Griffin,* 459 A.2d 1086, 1089 (Me.1983).

[¶ 13] In the present case, the question is whether, on these facts, Chauvette's attempt to prevent Kirby from closing the door, thus technically forcing entry into a private home without a warrant, was unlawful. In other words, was her extension of the detention into the doorway reasonable in light of her concern for the safety of herself and others?

[¶ 14] The First Circuit recently considered the issue of balancing officer safety with the sanctity of the home in *United States v. Romain,* 393 F.3d 63 (1st Cir. 2004). In that case, two officers had entered the defendant's home, without a war-

---

**3.** "Probable cause exists when the officers' personal knowledge of facts and circumstances, in combination with any reasonably trustworthy information conveyed to them, would warrant a prudent person to believe that [there is] evidence of a crime." *State v. Higgins,* 2002 ME 77, ¶ 21, 796 A.2d 50, 56–57 (quotation marks omitted).

rant, in response to a 911 call. *Id.* at 66. When the defendant acted in an aggressive manner, the officers seized him and patted him down for weapons. *Id.* at 66–67. In an attempt to suppress the evidence subsequently seized, the defendant asserted that "the Terry doctrine lacks force within the home because of the heightened expectations of privacy that operate in that domain." *Id.* at 74. The First Circuit rejected that argument, stating

> [w]e find no support for the proposition that the in-home setting automatically eclipses any and all interests in officer safety. To the contrary, in deciding whether a requirement less demanding than probable cause can justify certain police activities involving the home, the [Supreme] Court has emphasized that there is no ready test for determining reasonableness.

*Id.* at 75 (quotation marks omitted). We find this reasoning persuasive.

■■ [¶ 15] In the present case, there can be little dispute that the deputies had reasonable suspicion to initially approach and question Kirby.[4] Therefore, the issue presented arose when Deputy Chauvette put herself in the doorway to keep Kirby from closing the door. She did not take this action with the intent to "seize" Kirby beyond the initial detention phase that had already taken place, but to maintain "the status quo," i.e., her own safety as well as the other deputy's, by keeping an intoxicated, uncooperative man away from weapons just a few feet away. The record further supports this, in that Kirby was offered two reasonable options to obtain his identification, which he chose to disre-

gard. *See Illinois v. McArthur*, 531 U.S. 326, 332, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) (noting that one of the considerations to use when determining the reasonableness of prohibiting someone from entering their home is whether "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy").

[¶ 16] Thus, the trial court could rationally have found that when Chauvette blocked the doorway with her body, the scope of the detention did not exceed the intended purposes of a *Terry* investigation at that point. Attempting to prevent a person from obtaining control of an assault rifle is fundamentally no different than seizing a pistol or knife from the body of a person during a weapons frisk. The deputies had little choice but to protect themselves by trying to keep Kirby away from the rifles while they determined what had transpired before their arrival (specifically, whether there had been reckless conduct), and while they assessed the current situation with respect to whether any further risks were posed to the occupants of the house, the neighbors, or themselves.

[¶ 17] Accordingly, we conclude that the court could have found that the deputies' detention of Kirby up to and including the struggle just inside the door was within the scope of a *Terry* investigation because it was initiated based on reasonable suspicion and was reasonable in its scope. Therefore, because there was no criminal trespass on the part of the deputies, Kirby's assertion of defense of premises was not applicable, and the court's judgments of conviction were not erroneous.[5]

---

4. Based on the neighbors' reports as well as what she observed as they entered Kirby's yard, Deputy Chauvette suspected "that there was a possibility of the charge of reckless conduct with a dangerous weapon." "A person is guilty of reckless conduct if he recklessly creates a substantial risk of serious bodily injury to another person." 17–A M.R.S.A. § 211(1) (1983).

5. We have considered Kirby's additional issues on appeal and conclude that they are without merit.