2007 ME 107

**STATE of Maine**

v.

**Christopher Nelson BILYNSKY.**

Supreme Judicial Court of Maine.

Argued: June 18, 2007.
Decided: Aug. 14, 2007.

G. Steven Rowe, Attorney General, James M. Cameron, Assistant Atty. General (orally), Augusta, for the State.

Justin W. Andrus, Esq. (orally), Bath, for the defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, CALKINS, LEVY, SILVER, and MEAD, JJ.

SILVER, J.

[¶ 1] Pursuant to a conditional plea agreement in which Christopher Nelson Bilynsky pleaded nolo contendere to criminal conspiracy (Class B), 17–A M.R.S. § 151(1)(B) (2006), Bilynsky appeals from the Superior Court's (Sagadahoc County, *Mills* and *Delahanty, JJ.*) denial of numerous motions. Addressing only those motions that merit our discussion, we determine that (1) a warrantless search of Bilynsky's home was justified by probable cause and exigent circumstances; (2) the court did not err in denying Bilynsky's motion for a *Franks* hearing; and (3) Bilynsky's due process rights were not violated. Accordingly, we affirm the court's denial of Bilynsky's motions.

## I. BACKGROUND

### A. Indictment and Plea Agreement

[¶ 2] In December 2004, the Sagadahoc County Grand Jury indicted Bilynsky on two counts of aggravated trafficking of scheduled drugs (Class A), 17–A M.R.S. § 1105–A(1)(B)(1) (2006); criminal conspiracy (Class B), 17–A M.R.S. § 151(1)(B); and unlawful possession of scheduled drugs (Class B), 17–A M.R.S. § 1107–A(1)(B)(3) (2006). Bilynsky pleaded not guilty to all four counts and the court disallowed bail.

[¶ 3] In May 2006, after numerous pre-trial motions, pursuant to M.R.Crim. P. 11(a)(2), Bilynsky entered into a conditional plea agreement, pleading nolo contendere to the criminal conspiracy charge.[1] Pursuant to the plea agreement, Bilynsky preserved the right to appeal from the court's orders denying his various pre-trial motions. Following the plea, the Superior Court (*Delahanty, J.*) sentenced Bilynsky to eight years incarceration for the criminal conspiracy conviction.

### B. Relevant Motions

#### 1. Motion to Suppress [2]

[¶ 4] In February 2005, pursuant to M.R.Crim. P. 41A, Bilynsky filed a motion to suppress evidence containing two separate grounds. First, Bilynsky contended that evidence included in the search warrant affidavit was illegally obtained in a prior search. In a written order, the court rejected that contention, determining that exigent circumstances justified the prior search. Second, Bilynsky contended that if the fruits of the previous search were excised, there was insufficient evidence to support a finding of probable cause. At hearing, the Superior Court orally denied the second of Bilynsky's contentions, reasoning that even if the fruits of the previous search were not considered, there was sufficient probable cause to issue the warrant.

#### 2. Motion for a *Franks* Hearing

[¶ 5] Pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), Bilynsky requested a hearing to challenge the veracity of statements included in the affidavit attached to the request for a search warrant. In a written order disposing of several motions, the court denied Bilynsky's request for a *Franks* hearing without explanation.

#### 3. Motion to Dismiss Due to the Destruction of Evidence

[¶ 6] Bilynsky filed a motion to dismiss contending that his due process rights were violated when the State destroyed evidence it seized when officers executed the search warrant at his residence. Bilynsky contended that items the State alleges he used for the production of methamphetamine were seized, photographed, and taken to the Department of Environmental Protection without testing and were destroyed. Bilynsky further contended that the items seized contained exculpatory evidence that should have been preserved, and that officers destroyed them in bad faith. The court denied the motion, concluding that there was no evidence that the investigating officers destroyed evidence in bad faith.

---

1. M.R.Crim. P. 11(a)(2) mentions only a "conditional guilty plea." The State, however, concedes that there appears to be no rationale for allowing conditional guilty pleas and disallowing conditional nolo contendere pleas.

2. Bilynsky filed two motions to suppress. The second motion included grounds that Bilynsky had demanded his then-attorney include in the first motion, but which the attorney omitted. The contentions included in the second motion do not merit further discussion.

C. The Investigation and Protective Sweep

[¶ 7] After two hearings on Bilynsky's motion to suppress, the court issued a written order finding the following facts.

[¶ 8] Daniel Rousseau, a Special Agent with the United States Drug Enforcement Agency and Barry Kelly, a Kennebec County Sheriff's Department Deputy and a Drug Task Force Officer, have extensive experience and training in the investigation of clandestine laboratories. On October 22, 2004, Rousseau received information from Kelly that police officers believed they had uncovered a clandestine laboratory containing suspicious chemicals. Rousseau entered the residence of Maurice Labonte, who was cooperating with the investigating officers. Rousseau observed containers, muriatic acid, pill dough, and a pasty material in a pie plate, materials he associated with an intermediate step in the process of manufacturing methamphetamine.

[¶ 9] The officers interviewed Labonte, who stated that Bilynsky had been involved in manufacturing methamphetamine for a long time. Labonte also stated that Bilynsky had cooked methamphetamine at Labonte's house three months ago. Labonte described that the cooking process involved significant fumes and occasional smoke, and yielded a product that, when consumed, produced both sickness and a high. Based upon the interview with Labonte and his personal observations, Rousseau concluded that Labonte was involved in the manufacturing of amphetamine or methamphetamine.

[¶ 10] The investigation continued at the residence of William Harmon, where officers discovered red phosphorous, a chemical used in the manufacturing of methamphetamine that emits a lethal gas. Harmon corroborated Labonte's informa-tion, stating that Bilynsky had manufactured methamphetamine in his presence, the manufacturing produced fumes, and when consumed, the end-product produced a reaction consistent with that of amphetamine or methamphetamine. Additionally, Harmon produced both a vial of a substance he described as methamphetamine, which tested positive for amphetamine, and a notebook that described the manufacturing process for methamphetamine.

[¶ 11] Harmon and Labonte both stated that Bilynsky possessed paraphernalia used to produce amphetamine and methamphetamine. Harmon stated that Bilynsky kept the paraphernalia in his red diesel van. Harmon and Labonte gave the officers directions to Bilynsky's residence, known as "the chicken barn." Tara Dry, Bilynsky's girlfriend, also resided at the chicken barn, and her father gave the officers directions to the residence.

[¶ 12] Kelly assembled a team to investigate Bilynsky's residence after speaking with officers from Sagadahoc and Kennebec counties, an assistant attorney general, and an assistant district attorney. Kelly next contacted Rousseau, who voiced concerns that Bilynsky was manufacturing methamphetamine and that public safety required that the laboratory be located and safely secured. Rousseau expressed particular concern that the manufacturing process would produce phosgene, an odorless, colorless, lethal gas. Rousseau authorized Kelly, based on exigent circumstances, to safely secure the residence if it appeared that methamphetamine manufacturing was in progress. Agents are trained to conduct a security sweep of the area if the manufacturing process is underway. The sweep consists of removing any occupants, ventilating and securing the area, and leaving as quickly as possible.

[¶ 13] Kelly located the chicken barn, and when he exited his vehicle he smelled the odor of chemicals used in the clandestine manufacturing of methamphetamine. He observed an electrical cord extending from a shed to the barn. He also noticed that despite the cool temperature—it was approximately forty degrees outside—an air conditioner attached to the chicken barn was turned on high. A cool temperature is part of the methamphetamine manufacturing process. He approached the barn and saw a container being heated, another part of the manufacturing process. He also noticed an individual inside the chicken barn who was not wearing a gas mask. Based upon his training and experience, Kelly knew that if methamphetamine was being manufactured without a mask, there was little time to enter and safely secure the building. He was alerted to the fact that people were inside the barn and was concerned about the safety of the officers and potential occupants of two residences proximate to the barn.

[¶ 14] Officers entered the barn without knocking, encountered both Bilynsky and Dry, conducted a quick search of the area to determine if anything was cooking, found various items typically used in manufacturing methamphetamine, and turned a propane tank off in the shed.

[¶ 15] The next day, pursuant to M.R.Crim. P. 41, Kelly requested that a magistrate issue a search warrant to search the chicken barn and all vehicles on the premises at the time of the search. Officers executed the warrant the day after it was issued and suspected methamphetamine manufacturing items were seized, photographed, and later destroyed.

## II. DISCUSSION

### A. The Motion to Suppress

[¶ 16] We apply two separate standards of review to the denial of a motion to suppress, reviewing the court's factual findings for clear error and its legal conclusions de novo. *State v. Sargent,* 2005 ME 78, ¶ 7, 875 A.2d 125, 127.

[¶ 17] We have held that, as a matter of law, a warrantless search is unreasonable unless: "(1) it is supported by probable cause; and (2) exigent circumstances exist requiring a prompt search, without the delay occasioned by the need for a warrant; or (3) the search is pursuant to another recognized exception to the warrant requirement." *State v. Leonard,* 2002 ME 125, ¶ 12, 802 A.2d 991, 994 (quotation marks omitted).

### 1. The Officers had Probable Cause

[¶ 18] Probable cause exist "when the officers' personal knowledge of facts and circumstances, in combination with any reasonably trustworthy information conveyed to them, would warrant a prudent person to believe that there is evidence of a crime." *State v. Kirby,* 2005 ME 92, ¶ 11 n. 3, 878 A.2d 499, 502 (quotation marks omitted); *see also, State v. Michael M.,* 2001 ME 92, ¶ 6, 772 A.2d 1179, 1182.

[¶ 19] At the time of the warrantless search of the chicken barn, officers had probable cause to believe they would find evidence of a crime. The officers gained information through two informants, Harmon and Labonte, both of whom had detailed knowledge of Bilynsky's involvement in the manufacturing of methamphetamine. Furthermore, both Harmon and Labonte independently stated that they had personally observed Bilynsky cook methamphetamine three months prior to the search. The cooking process resulted in a drug that produced effects consistent with the use of methamphetamine. Although Harmon and Labonte were under investigation for the manufacturing of methamphet-

amine, and had an incentive to cooperate with the investigating officers and provide information that would take the investigation away from them, as aspiring manufacturers, they also had a basis of knowledge on which to rest their conclusions.

[¶ 20] Harmon and Labonte also provided specific information detailing the location of Bilynsky's residence and the means by which he transported his manufacturing paraphernalia. The officers corroborated both the location of the chicken barn and the presence of the red van that Harmon and Labonte described.

[¶ 21] Upon arrival at the chicken barn, Kelly observed evidence that confirmed Harmon's and Labonte's statements that Bilynsky was involved in the manufacturing of methamphetamine. Kelly smelled an odor consistent with odors produced in the manufacturing process; he noticed an air conditioner turned on high, despite a cool ambient temperature; and he observed an individual not wearing a gas mask heating a container.

[¶ 22] The officers were justified in relying upon Harmon's and Labonte's three-month-old information in determining probable cause. We have considered the following circumstances in determining whether evidence sought is likely to remain in place at the time of a search:

(1) the character of the criminal activity under investigation, i.e., discrete crime or regenerating conspiracy; (2) the character of the accused, i.e., nomadic or entrenched; (3) the character of the thing to be seized, i.e., whether it is perishable or easily transferable; and (4) the place to be searched, i.e., forum of convenience or operational base.

*State v. Wright,* 2006 ME 13, ¶ 9 n. 3, 890 A.2d 703, 706.

[¶ 23] The statements given to the officers indicated that Bilynsky was not involved in a single, isolated, criminal incident, but a complex and continuing criminal enterprise. The laboratory equipment, though apparently portable, was likely to be in existence as long as the manufacturing of methamphetamine continued, and the chicken barn was described as a permanent headquarters for Bilynsky's operation, not a temporary outpost. Indeed, the information provided did not describe a fleeting operation, but an entrenched clandestine laboratory. These circumstances suggested that, in all likelihood, Bilynsky's methamphetamine manufacturing continued for the three months since his last encounter with Labonte.

[¶ 24] Additionally, to the extent that the information supplied by Harmon and Labonte was stale, Kelly's personal observations, which corroborated their statements, freshened the old information. *See id.* ¶ 11, 890 A.2d at 706.

[¶ 25] The combination of the statements conveyed to the officers by Harmon and Labonte and the officers' personal observations before they entered the chicken barn would warrant a prudent person to believe that the premises contained evidence of the manufacturing of methamphetamine.

2. Exigent Circumstances Existed

[¶ 26] Determining that there was probable cause extends our inquiry into whether exigent circumstances justified the officers' warrantless entry into the chicken barn. "Exigent circumstances exist when there is a compelling need to conduct a search and insufficient time in which to secure a warrant." *State v. St. Yves,* 2000 ME 97, ¶ 19 n. 8, 751 A.2d 1018, 1023 (quotation marks omitted).

[¶ 27] In *Leonard,* we determined that exigent circumstances justified the search of a residence, the scene of a stand-off,

after the stand-off ended to determine if: other individuals may been have injured; unsafe conditions posed a threat to individuals; and evidence could potentially be lost or destroyed. 2002 ME 125, ¶ 13, 802 A.2d at 994. We further determined that exigent circumstances exist when it is reasonably believed "that a person is in imminent danger of death or serious bodily harm." *St. Yves,* 2000 ME 97, ¶ 19 n. 8, 751 A.2d at 1023 (citations omitted). Thus, we have determined that exigent circumstances may include a threat to the safety of members of the public or police officers. However, we have not addressed whether the exigent circumstances doctrine applies to the threat an operating clandestine methamphetamine laboratory poses to public and officer safety.

[¶ 28] Other courts have decided that narrow issue. In *United States v. Williams,* 431 F.3d 1115 (8th Cir.2005), the Eighth Circuit Court of Appeals determined whether the discovery of a methamphetamine lab constituted an exigent circumstance. In *Williams,* officers arrested an individual for processing and manufacturing methamphetamine. *Id.* at 1117. The individual told the officers that he had recently visited Williams's home, which contained a methamphetamine laboratory. *Id.* The individual gave the officers a description of the home and positively identified Williams. *Id.* The officers located Williams's home and observed evidence indicative of ongoing methamphetamine production. *Id.* The officers detained Williams outside his house and upon approaching his home, one officer smelled chemicals utilized in the methamphetamine manufacturing process. *Id.* The officers entered the house, observed evidence of a methamphetamine laboratory in plain view, ventilated the home, and quickly left. *Id.* The officers later obtained a search warrant. *Id.*

[¶ 29] The Eighth Circuit determined that the officers reasonably concluded that it was necessary to protect their own and local residents' safety by conducting a protective sweep of the home. *Id.* at 1118.

[¶ 30] Although determining exigent circumstances is inherently fact-specific, *Williams* is consistent with the way in which other courts have determined whether exigent circumstances existed in methamphetamine cases. In a case prior to *Williams,* the Eighth Circuit noted that "[t]he potential hazards of methamphetamine manufacture are well documented, and numerous cases have upheld limited warrantless searches by police officers who had probable cause to believe they had uncovered an on-going methamphetamine manufacturing operation." *United States v. Walsh,* 299 F.3d 729, 734 (8th Cir.2002). The court cited five cases from the Ninth and Tenth Circuits to support that proposition. *Id.* Courts outside the Eighth, Ninth, and Tenth Circuits have reached the same result. *See, e.g., United States v. Denson,* No. 1:05–CR–088, 2006 WL 270287, at *4, 2006 U.S. Dist. LEXIS 7898, at *11–12 (E.D.Tenn. Feb.2, 2006); *People v. Duncan,* 42 Cal.3d 91, 227 Cal.Rptr. 654, 720 P.2d 2, 10–11 (1986); *Holder v. State,* 847 N.E.2d 930, 939–40 (Ind.2006); *State v. Castile,* No. M2004–02572–CCA–R3–CD, 2006 WL 1816371, at *8–9, 2006 Tenn. Crim.App. LEXIS 492 at *23–24 (Tenn. Crim.App. June 28, 2006).

[¶ 31] Courts, however, have also limited use of the exigent circumstances doctrine in methamphetamine cases. In *United States v. Chambers,* the Sixth Circuit determined that officers had "create[d]" an exigency when they approached a house that had been under surveillance for months for suspected methamphetamine production to talk to its residents, and then used a resident's refusal of consent to enter as justification for entry. 395 F.3d

**1176**

563, 568–69 (6th Cir.2005). Courts have also declined to find probable cause based solely on the odor of a legal substance which is associated with methamphetamine production. *See, e.g., United States v. Berry,* 468 F.Supp.2d 870, 882 (N.D.Tex. 2006); *Bennett v. State,* 345 Ark. 48, 44 S.W.3d 310, 314–15 (2001).

[¶ 32] On the facts of the present case, exigent circumstances justified the officers' warrantless entry into Bilynsky's residence. The officers had detailed information concerning Bilynsky's involvement in the manufacturing of methamphetamine, much of which was verified upon their arrival at Bilynsky's residence. Soon after their arrival, the officers observed evidence that Bilynsky was manufacturing methamphetamine: an air conditioner was on high, providing the requisite cool temperature for production; and Kelly smelled fumes that he associated with the manufacturing process. Evidence that amounted to probable cause that manufacturing was in progress, coupled with Kelly's knowledge of the safety risks associated with the process, provided an adequate basis for a limited warrantless entry to conduct a protective sweep of the residence.

[¶ 33] Premised on safely securing the area, the search did not exceed the bounds of exigency that justified the warrantless entry. *See Horton v. California,* 496 U.S. 128, 139–40, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). The search was brief, and it ended once it was determined that the area was safe. The officers did not conduct a thorough search of the residence. For that, the officers later secured a warrant.

[¶ 34] The facts under which our sister courts did not find exigent circumstances in methamphetamine cases are not present in this case. Probable cause was generated not solely on the smell of methamphetamine production, but also upon information provided from two individuals and the personal observations of the officers. The officers also did not generate the exigency through any of their actions. We accordingly determine that exigent circumstances justified the officers' warrantless search of the chicken barn.

[¶ 35] Because the warrantless search of Bilynsky's residence was supported by both probable cause and exigent circumstances, we do not address Bilynsky's alternative argument that if the fruits of the search were excluded, there would have been insufficient evidence to support a finding of probable cause.

**B. The Motion for a *Franks* Hearing**

[¶ 36] Bilynsky contends that the sworn affidavit of a private investigator demonstrated that both Harmon's and Labonte's statements, on which the warrant affidavit relied, were unreliable. Bilynsky further contends that the warrant affidavit intentionally omitted the fact that the smell that Kelly described as chemical was actually incense.

[¶ 37] We have yet to determine how we review the denial of a *Franks* hearing. In *State v. Dickinson,* we declined to address whether a de novo or a clear error standard applied to the denial of a *Franks* motion, noting that federal courts were divided on the issue and, under either standard, the result in that case was the same. 2005 ME 100, ¶ 9 n. 5, 881 A.2d 651, 655. We again decline to address the applicable standard of review because regardless of what standard is applied, we uphold the court's denial of the motion for a *Franks* hearing.

[¶ 38] To obtain a *Franks* hearing, a defendant must "make allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof."

*Id.* ¶ 8, 881 A.2d at 655 (quoting *Franks*, 438 U.S. at 171, 98 S.Ct. 2674). Bilynsky asserts that Harmon's and Labonte's statements are unreliable. He does not, however, make any specific allegation that the statements they made included in the affidavit are deliberately false. Likewise, Bilynsky's contention that Kelly's assertion that he smelled chemicals was deliberately false is not supported by any offer of proof, and is speculative as to what Kelly knew at the time he composed his affidavit. The showing Bilynsky is required to make to obtain a *Franks* hearing requires more than such guessing.

## C. Bilynsky's Due Process Rights were not Violated

[¶ 39] Bilynsky contends that officers destroyed in bad faith items allegedly used in the manufacturing process that had exculpatory value because the items had Tara Dry's fingerprints on them, and could have been used to produce biofuel instead of methamphetamine.

[¶ 40] Bilynsky initially presented his contention that his due process rights were violated in a motion to dismiss and appeals the denial of that motion to us. That is not, however, the appropriate way to challenge the impermissible destruction of evidence. We have indicated that the suppression of that evidence is the appropriate remedy. *See State v. Anderson*, 1999 ME 18, ¶ 6, 724 A.2d 1231, 1233 (reviewing the trial court's determination that the destruction of evidence did not violate due process using the standard of review applied to motions to suppress).[3] Accordingly, we construe the District Court's denial of the motion to dismiss as a ruling on a motion to suppress.

[¶ 41] We have adopted the United States Supreme Court's analysis to determine when the destruction of evidence violates a defendant's right to due process of the law. *See State v. Berkley*, 567 A.2d 915, 917–18 (Me.1989); *Anderson*, 1999 ME 18, ¶¶ 6–9, 724 A.2d at 1233–34. In *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the Court fashioned a two-part test to determine whether a defendant's right to due process is violated by the failure to preserve evidence, (1) "the evidence must 'possess an exculpatory value that was apparent before the evidence was destroyed;' " and (2) "the evidence must 'be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' " *Berkley*, 567 A.2d at 917–18 (quoting *Trombetta*, 467 U.S. at 489, 104 S.Ct. 2528). Applying the first step of the *Trombetta* test, Bilynsky overstates the exculpatory value of the fingerprints. Bilynsky contends that the presence of other fingerprints on glass items that the State alleges were used to manufacture methamphetamine gives the items exculpatory value. The fact that other people may have touched items which Bilynsky also handled does not diminish what the State alleged: that Bilynsky conspired to manufacture methamphetamine.

[¶ 42] Applying the second step, we reject Bilynsky's contention that his due process rights were violated because if the evidence had not been destroyed, he could have argued that the glassware was unfit for use in the methamphetamine manufacturing process. To advance this contention, Bilynsky does not need the items themselves because the State took photo-

---

3. Further, the Maine Rules of Criminal Procedure do not allow for such a dismissal. A motion to dismiss may be made pursuant to M.R.Crim. P. 6(b)(2) on the lack of qualifica-tions of a member of the grand jury, pursuant to M.R.Crim. P. 48(a) by the State, or 48(b) by the court, if there is an unnecessary delay in bringing a defendant to trial.

graphs of the evidence before their destruction. Similarly, Bilynsky does not need the items themselves to advance his alternative use theory that they could have been used to produce biofuel.

The entry is:

Judgment affirmed.