

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00560-CR

| | | |
|---|---|---|
| Michael Fred Wehrenberg | § | From the 43rd District Court |
| | § | of Parker County (CR11-0090) |
| v. | § | November 8, 2012 |
| | § | Opinion by Justice Meier |
| The State of Texas | § | (p) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was error in the trial court's order. It is ordered that the trial court's order denying Michael Fred Wehrenberg's motion to suppress in part is reversed and this case is remanded for further proceedings consistent with this opinion.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Bill Meier



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00560-CR
### NO. 02-11-00561-CR

MICHAEL FRED WEHRENBERG                                          APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

----------

FROM THE 43RD DISTRICT COURT OF PARKER COUNTY

----------

## OPINION

----------

## I. INTRODUCTION

Appellant Michael Fred Wehrenberg appeals the trial court's denial in part of his motion to suppress evidence. We consider several dispositive issues in this appeal, including (1) whether facts that a person is "going to" manufacture methamphetamine provides exigent circumstances justifying a warrantless entry into a residence, and (2) whether the federal independent source doctrine applies

to except the challenged evidence from the Texas exclusionary rule. Our answer to both queries: No. We will reverse the trial court's orders denying in part Wehrenberg's motion to suppress evidence and remand this cause to the trial court.

## II. BACKGROUND

Police had been conducting surveillance of a residence located at 501 Center Point Road in Parker County for about thirty days when on or about August 31, 2010, a confidential informant notified investigators that a number of individuals who were located at the residence were "fixing to" cook methamphetamine. A few hours later, police officers, including Investigator Luis Montanez, proceeded to the residence and, without a search warrant, entered through the front door; removed several "subjects"—including Wehrenberg—from inside and placed them in the front yard, handcuffed; and performed a protective sweep of the premises. No one had given the police permission to enter the residence, and no one was cooking methamphetamine when the police arrived and "secured" the residence. Investigator Montanez prepared a search warrant affidavit with the help of another investigator, and about an hour after police had secured the residence, a magistrate signed a warrant authorizing a search of the residence. Police then searched the residence and discovered the following items, among others: a coffee grinder with residue, Oxycodone, lithium batteries, empty blister packets, a vial with liquid, red and clear liquid, wet powder inside of

3

a shed, stripped lithium batteries, and empty pseudoephedrine boxes. Police arrested Wehrenberg after conducting the search.

Wehrenberg moved to suppress all of the tangible evidence seized in connection with both cases. The trial court granted the motion to suppress as to any evidence seized pursuant to the initial "detention" of Wehrenberg but denied the motion as to any evidence seized pursuant to the search warrant that police later obtained and executed. The trial court did not enter findings of fact and conclusions of law, although Wehrenberg requested such findings and conclusions. Wehrenberg ultimately pleaded guilty, pursuant to a plea bargain, to (a) possession of between four and two hundred grams of methamphetamine and (b) possession or transport of chemicals with the intent to manufacture methamphetamine, and the trial court sentenced him to five years' confinement in each cause. Wehrenberg preserved his right to appeal the trial court's denial in part of his motion to suppress.

### III. METHAMPHETAMINE, WARRANTLESS ENTRY, AND *SEGURA*

Wehrenberg argues in his only point that the trial court reversibly erred by denying in part his motion to suppress. He contends that in light of the trial court's determination that the initial warrantless entry into the residence was illegal, his detention and removal from the residence was illegal, and "such illegality tainted the subsequently obtained search warrant for the residence." Wehrenberg argues that the independent source doctrine does not apply to allow admission of the complained-of evidence despite the illegal taint because "the

4

search warrant was not based entirely on information obtained before the illegal entry."

The State argues that the trial court did not err by denying Wehrenberg's motion to suppress because probable cause and exigent circumstances justified the warrantless entry and, alternatively, the independent source doctrine applies to except the evidence from the exclusionary rule.

## A.    Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review.  *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor.  *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

When the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings.  *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede v. State*, 214 S.W.3d 17, 25

5

(Tex. Crim. App. 2007). We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *State v. Kelly*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006).

### B.     Legality of Warrantless Entry

We begin our analysis by considering whether the initial warrantless entry into the residence by police was legal. This is a logical starting point because if the warrantless entry was justified, then there was no residual taint that could have rendered the subsequent search invalid, and Wehrenberg's argument— which presupposes the illegality of the warrantless entry—fails. And although the trial court suppressed any evidence seized pursuant to the initial detention of Wehrenberg, we may still review the legality of the warrantless entry because we are required to uphold the trial court's ruling denying the motion to suppress if it is supported by the record and correct under any theory of law applicable to the case, even if the trial court gave the wrong reason for its ruling. *See State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

### 1.     Exigent Circumstances

An unconsented police entry into a residence constitutes a search. *McNairy v. State*, 835 S.W.2d 101, 106 (Tex. Crim. App. 1991); *see Parker v. State*, 206 S.W.3d 593, 596 n.7 (Tex. Crim. App. 2006). A warrantless search of a residence is presumptively unreasonable. *Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007). For a warrantless search to be justified, the State

6

must show (1) the existence of probable cause at the time of the search and (2) exigent circumstances that made procuring a warrant impracticable.[1] *McNairy*, 835 S.W.2d at 106; *see Estrada*, 154 S.W.3d at 608. If either probable cause or exigent circumstances are not established, a warrantless entry will not pass muster under the Fourth Amendment. *Parker*, 206 S.W.3d at 597.

### a. Probable Cause

Probable cause to search exists when reasonably trustworthy facts and circumstances within the knowledge of the officer on the scene would lead a man of reasonable prudence to believe that the instrumentality of a crime or evidence of a crime will be found. *McNairy*, 835 S.W.2d at 106. Probable cause has been described as "the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers. We weigh not individual layers but the 'laminated total . . . [.]'" *See id.* (citing *Brinegar v. United States*, 338 U.S. 160, 69 S. Ct. 1302 (1948)).

Investigator Montanez testified at the hearing on the motion to suppress that a confidential informant had notified him that the occupants of the residence located at 501 Center Point Road were preparing to cook methamphetamine. Investigators had used the confidential informant in the past, and the informant, who was familiar with methamphetamine and the manufacture of

---

[1]No other established exceptions to the warrant requirement (voluntary consent and search incident to arrest) apply here. *See McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App.), *cert. denied*, 540 U.S. 1004 (2003).

7

methamphetamine, had provided reliable information.  In this circumstance, the informant gave Investigator Montanez specific information about the method by which the methamphetamine was being manufactured, and based on Investigator Montanez's knowledge and experience, he determined that the occupants of the residence were utilizing the "shake-and-bake" method, which involves combining numerous ingredients into a plastic bottle.  Investigator Montanez said that he corroborated the informant's information by running a check of the names of the people who were apparently inside of the residence, which had been under police surveillance.  Investigator Montanez explained that he knew that Wehrenberg was at the residence because police had performed a "knock and talk" at the same location about three months earlier, resulting in a warrant being subsequently issued and Wehrenberg being arrested for possession of a controlled substance.

Given the sum total of information available to Investigator Montanez, including the reasonable inferences that could be drawn from that information, probable cause existed at the time of the warrantless entry into the residence.

### b.     Exigent Circumstances

Three categories of exigent circumstances justify a warrantless intrusion by police officers:  providing aid or assistance to persons whom law enforcement reasonably believes are in need of assistance; protecting police officers from persons whom they reasonably believe to be present, armed, and dangerous; and preventing the destruction of evidence or contraband.  *Gutierrez*, 221

8

S.W.3d at 685. Investigator Montanez testified that he secured the residence without a warrant "to prohibit destruction of evidence."

Regarding destruction of evidence as an exigent circumstance, the State must show "that the police could have reasonably concluded that evidence would be destroyed or removed before they could obtain a search warrant." *McNairy*, 835 S.W.2d at 107. Circumstances relevant to a reasonable determination by searching officers that evidence might be destroyed or removed before they could obtain a search warrant include (1) the degree of urgency and the amount of time necessary to obtain a warrant, (2) the reasonableness of the belief that the contraband is about to be removed, (3) the possibility of danger to the police officers securing the site while a search is sought, (4) the suspects' awareness of police presence or surveillance, and (5) the ready destructibility of the contraband. *Id.* (citing *United States v. Rubin*, 474 F.2d 262, 268 (3d Cir.), *cert. denied*, 414 U.S. 833 (1973)).

The State concedes that there is no evidence to support the third and fourth criteria set out immediately above, but it argues that there is evidence to support the first, second, and fifth criteria. Specifically, the State directs us to Investigator Montanez's testimony that police secured the residence without a warrant because "we were advised by the CI that the subjects were going to cook methamphetamine prior to the Search Warrant. So we had to go in and secure the residence." Investigator Montanez explained that the confidential informant had told him that the occupants of the residence "were fixing to cook

9

methamphetamine."  From this testimony, the State identifies two reasons why exigent circumstances justified the warrantless entry:  (1) the volatile nature of manufacturing methamphetamine, including by using the "shake-and-bake" method; and (2) the inevitable "destruction" of various chemicals that, when combined, are used to manufacture methamphetamine.

Investigator Montanez explained that the process of manufacturing methamphetamine may cause volatile and hazardous conditions, including fires and explosions.  Regarding the "shake-and-bake" method, Investigator Montanez said that "the chemical reaction in the process of making [methamphetamine] can burn a hole through the bottom of the bottle, which can cause a huge fire.  It can go up pretty quick."  He related a past experience in which he and several other officers had conducted a "knock-and-talk" at a suspected methamphetamine lab, and after the subject opened and then slammed the door shut, a fire started inside of the building and caused an explosion.[2]  In fact, Investigator Montanez had noted in his report that "one of [the subjects inside the residence] had already attempted to make [methamphetamine] and they had burned themselves.  They'd already caused a fire in the house once already."  Thus, according to the investigator, "I was afraid that they would begin making the methamphetamine and then a fire would break out."  However, despite his

---

[2]Investigator Montanez did not say whether the "shake-and-bake" method of manufacturing methamphetamine had been utilized before the explosion occurred.

10

concern about a fire, Investigator Montanez agreed with the trial court that "[m]ost people don't blow themselves up making this stuff"; "[t]hey unfortunately successfully make methamphetamine for use and distribution."

Regarding the State's contention that chemicals are "destroyed" when combined to manufacture methamphetamine, it points to Investigator Montanez's testimony explaining the "shake-and-bake" method. He testified,

> It's where they combine all their ingredients, such as lithium batteries, the pseudoephedrine, various chemicals such as drain cleaner, sulphuric acid. They basically put all this inside a bottle, at which point when they drop the lithium battery, it causes a reaction with the water and all the other ingredients involved.
>
> And then they shake it up and it creates a gas which separates the pseudoephedrine from the pill, which makes methamphetamine. And methamphetamine usually sits at the top of it after it's done, which causes a fire reaction and things of that nature.

The State argues,

> In light of this testimony and reviewing the definition of what it means to 'manufacture' a controlled substance, it can be concluded that some of the chemicals, especially the pseudoephedrine, are 'destroyed' during the production process by its conversion via 'chemical synthesis' into methamphetamine, possession of which is a separate criminal offense which was also then being investigated. [citations omitted]

Imminence is a critical, sometimes dispositive, aspect of an exigent circumstances inquiry. The United States Supreme Court recognized this in *Roaden v. Kentucky*, wherein it reasoned, "Where there are exigent circumstances in which police action *literally must be 'now or never'* to preserve the evidence of the crime, it is reasonable to permit action without prior judicial

11

evaluation." 413 U.S. 496, 505, 93 S. Ct. 2796, 2802 (1973) (emphasis added).

Courts, including the Supreme Court, even go so far as to specifically refer to the destruction-of-evidence category of exigent circumstances as the "imminent destruction of evidence." *See, e.g.*, *Welsh v. Wisconsin*, 466 U.S. 740, 754, 104 S. Ct. 2091, 2100 (1984) ("[M]ere similarity to other cases involving the imminent destruction of evidence is not sufficient."); *United States v. Dawkins*, 17 F.3d 399, 405 (D.C. Cir. 1994) ("We have long recognized that the imminent destruction of evidence may constitute an exigency excusing the failure to procure a warrant."); *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1512 (6th Cir. 1988) ("When police officers seek to rely on this exception in justifying a warrantless entry, they must show an objectively reasonable basis for concluding that the loss or destruction of evidence is imminent.").

Texas courts considering whether exigent circumstances justified a warrantless entry to prevent the destruction or removal of evidence also must consider imminence; the first, second, and fifth *McNairy* criteria—the degree of *urgency* and the amount of *time necessary* to obtain a warrant, the reasonableness of the belief that the contraband is *about* to be removed, and the *ready* destructibility of the contraband—each impliedly reference the requirement that the destruction or removal of evidence be imminent. *See McNairy*, 835 S.W.2d at 107. Caselaw analyzing exigent circumstances reflects this. In *McNairy*, exigent circumstances justified a warrantless entry because police smelled the strong odor of methamphetamine emanating from a trailer, heard the

12

back door of a trailer thrown open and people running into the brush, and anyone remaining in the trailer would have known that the police were on the scene, and the people could have destroyed the evidence in a matter of minutes. *McNairy*, 835 S.W.2d at 103, 107. In *Estrada*, exigent circumstances permitted a warrantless entry into a residence from which the odor of marijuana was emanating because a police officer heard voices and running inside of the residence when he knocked and observed several people attempting to leave the residence before he returned a second time to investigate further. *Estrada*, 154 S.W.3d at 609–10. And in *Parker v. State*, exigent circumstances existed for a warrantless entry into a residence because officers smelled burned marijuana, heard someone inside the residence announce that the police were at the front door when they approached, and observed someone running upstairs after the announcement. 223 S.W.3d 385, 388–89 (Tex. App.—Amarillo 2005), *aff'd*, 206 S.W.3d 593 (Tex. Crim. App. 2006). In each of those cases, exigent circumstances justified a warrantless entry because the police could have reasonably concluded that the destruction or removal of evidence before a search warrant could be obtained was imminent.

Cases involving the manufacture of methamphetamine are no exception to the imminence requirement. In *United States v. Rhiger*, federal drug agents observed appellant drive to several locations and purchase materials used to manufacture methamphetamine. 315 F.3d 1283, 1285 (10th Cir.), *cert. denied*, 540 U.S. 836 (2003). About an hour after the agents saw appellant enter a

13

residence with the purchased materials, they "detected the smell of cooking methamphetamine." *Id.* "Fearing an active methamphetamine lab was in the residence and could explode," the agents entered the home without a warrant, found an "active" lab in the garage, and arrested appellant. *Id.* Observing that the "government presented evidence indicating the federal agents had reasonable grounds to believe there was an immediate need to protect themselves and the public from the potential explosion of the methamphetamine lab," the court held that exigent circumstances justified the warrantless entry in light of, among other things, "the strong odor of *cooking* methamphetamine emitting from" the residence and the agent's "knowledge of the inherent dangerousness of an *active* methamphetamine lab." *Id.* at 1288–89 (emphasis added).

In *United States v. Walsh*, officers received an anonymous tip that two people were operating a methamphetamine lab at a particular residence. 299 F.3d 729, 730–31 (8th Cir.), *cert. denied*, 537 U.S. 1066 (2002). Officers were given consent to search all but two parts of the residence—a back bedroom and a storage shed. *Id.* at 731. While outside near the storage shed, an officer noticed empty cans of fluid on the back porch, an extension cord running to the storage shed, white residue inside a blender pitcher, two-liter soda bottles, and the strong smell of ether. *Id.* The officer opened the door to the shed and, among other things, noticed a "white mist hanging in the air." *Id.* Police later obtained a warrant and searched the shed and back bedroom. *Id.* at 732. The

14

court of appeals held that exigent circumstances justified the warrantless entry into the storage shed because "the strong smell of ether and the equipment and residue found in the carport area suggested *on-going* manufacture in the shed." *Id.* at 734 (emphasis added). According to the court, "Officer Cantrell could not be certain no one was hiding (or worse yet, lying unconscious) in the shed, and officer McPhail was justified in verifying that no *untended heat source* was creating an imminent risk of fire or the explosion of volatile chemicals." *Id.* (emphasis added).

In *United States v. Wilson*, exigent circumstances justified a warrantless entry into a house because officers smelled ether, which is commonly present during the manufacture of methamphetamine; saw a liquid, which smelled like ether, pouring out of the garage; heard movements from within the garage; and after arresting two people on the doorstep of the house, reasonably believed that other persons might be inside the house who could attempt to destroy evidence. 865 F.2d 215, 216–17 (9th Cir. 1989). The court noted that one of the officers "recognized a pressing need to prevent the ether from exploding and causing a fire." *Id.* at 217.

Thus, whether it was the odor of ether, ether running on the ground, or the observance of articles associated with the ongoing manufacture of methamphetamine, in each of the three preceding cases, officers observed facts that led them to believe that someone was *actively* manufacturing methamphetamine. This fact was significant to the exigent-circumstances inquiry

15

because it sustained the officers' belief that the destruction or removal of evidence was imminent—a result that could have occurred due to the inherent volatility associated with the active manufacture of methamphetamine.

Here, unlike the officers in *Rhiger*, *Walsh*, and *Wilson*, Investigator Montanez did not testify that he observed anything that led him to believe that someone was actively manufacturing methamphetamine at the residence. Instead, the record demonstrates (1) that Investigator Montanez had information that the occupants of the residence were "going to" or "fixing to" manufacture methamphetamine, and (2) that officers arrived at the residence and entered without a warrant.[3]  Therefore, notwithstanding that a fire was alleged to have previously occurred at some point at the residence as a result of manufacturing methamphetamine, in the absence of any evidence that could have led the officers to believe that someone was actively manufacturing methamphetamine, officers could not have reasonably concluded that the destruction or removal of evidence was *imminent* due to either the inherently volatile nature of *manufacturing* methamphetamine or the inevitable "destruction" of various chemicals when combined *to manufacture* methamphetamine.  *See, e.g.*, *State v. Meeks*, 262 S.W.3d 710, 726–27 (Tenn. 2008) (holding that hazards posed by

---

[3]At one point during the hearing on the motion to suppress, Investigator Montanez testified that he had information that the occupants of the house "were cooking" methamphetamine, but there is nothing to indicate that he was referring to any evidence other than the information that was initially relayed to him by the confidential informant.

*actively* operating methamphetamine lab created exigent circumstances justifying warrantless search); *Williams v. State*, 995 So.2d 915, 921 (Ala. 2008) ("Based on the inherent dangers of an *operating* methamphetamine lab, we now hold that discovery of such a lab by law-enforcement officials constitutes an exigent circumstance justifying a warrantless search" (emphasis added)); *State v. Bilynsky*, 932 A.2d 1169, 1176 (Me. 2007) (holding that exigent circumstances justified warrantless entry because officers observed facts demonstrating that manufacturing methamphetamine was "in progress"); *Bishop v. Commonwealth*, 237 S.W.3d 567, 570 (Ky. Ct. App. 2007) ("[T]he court did not clearly err by finding that a search was justified by the exigent circumstances created when an *active* methamphetamine lab was found in the trunk of a car . . . ." (emphasis added)). Although probable cause existed at the time of the warrantless entry, there is nothing in the record to indicate that the officers were confronted with a "now or never"-type situation, one in which they had to act before obtaining a warrant in order to head off the possible destruction or removal of evidence caused by the volatility inherently associated with the actual manufacture of methamphetamine. *See Roaden*, 413 U.S. at 505, 93 S. Ct. at 2802; *State v. Moore*, 183 P.3d 158, 161 (N.M. Ct. App. 2008) (reasoning that "mere probable cause that a methamphetamine lab *exists* is not per se an exigent circumstance that will justify a warrantless entry into a home" (emphasis added)). Contrary to the State's argument, the first, second, and fifth *McNairy* criteria do not support a conclusion that exigent circumstances justified the warrantless entry.

17

Accordingly, we may not affirm the trial court's denial of Wehrenberg's motion to suppress on this ground.

### 2. Emergency Doctrine

Investigator Montanez agreed with the trial court that a "community caretaking function" existed to establish exigent circumstances, but the State has expressly declined to provide any argument thereunder. In light of Investigator Montanez's testimony, we feel compelled to address this issue because it is another basis upon which we could potentially affirm the trial court's orders denying in part Wehrenberg's motion to suppress. *See Stevens*, 235 S.W.3d at 740; *Armendariz*, 123 S.W.3d at 404.

In *Laney v. State*, the court of criminal appeals explained that the "community caretaker functions" serve as a basis for three separate exceptions to the warrant requirement, one being the emergency doctrine. 117 S.W.3d 854, 860 (Tex. Crim. App. 2003). The emergency doctrine "applies when the police are acting, not in their 'crime-fighting' role, but in their limited community caretaking role to 'protect or preserve life or avoid serious injury.'" *Id.* at 861. The court of criminal appeals said,

> "We have used an objective standard of reasonableness in determining whether a warrantless search is justified under the Emergency Doctrine." This objective standard looks at the police officer's conduct and "takes into account the facts and circumstances known to the police at the time of the search." Furthermore, we look to ensure that the warrantless search is "strictly circumscribed by the exigencies which justify its initiation."

*Id.* at 862 (citations omitted).

18

Here, we cannot conclude that the actions of Investigator Montanez and the police were "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Laney*, 117 S.W.3d at 862 (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973)). Police had been conducting surveillance of the residence for some time, and after entering the residence, police handcuffed the occupants, obtained the warrant, searched the residence, and discovered evidence that led to these prosecutions. As the court of criminal appeals has observed, "[t]here is a difference between rendering emergency aid and investigating the possibly criminal cause of the emergency. The emergency doctrine justifies the former, but it does not always justify the latter." *Bray v. State*, 597 S.W.2d 763, 768 (Tex. Crim. App. [Panel Op.] 1980).

Moreover, although Investigator Montanez expressed a concern about the possibility of a fire resulting from the manufacture of methamphetamine, as thoroughly explained above, there is no evidence that someone was manufacturing methamphetamine.

We hold that the emergency doctrine could not have justified the officers' warrantless entry into the residence. Therefore, we may not affirm the trial court's denial of Wehrenberg's motion to suppress on this ground.

C.    *Segura* Issues

Both Wehrenberg and the State direct us to *Segura v. United States*, 468 U.S. 796, 104 S. Ct. 3380 (1984). Wehrenberg argues that the independent

19

source doctrine, as articulated and applied in *Segura*, is irrelevant under the facts of this case. The State argues that two different holdings in *Segura* apply to allow admission of the challenged evidence—the holding regarding the independent source exception and the holding addressing Segura's seizure argument.

Police arrested Segura in his apartment building on charges that he had sold cocaine. *Id.* at 800, 104 S. Ct. at 3383. They escorted him up to his apartment and knocked on the door. *Id.* When a lady answered the door, the officers entered the apartment with Segura, without requesting or receiving permission, and informed several others in the apartment that Segura was under arrest and that a search warrant for the apartment was being obtained. *Id.* The police conducted a limited security check of the apartment and noticed several items of contraband, which they left undisturbed. *Id.* at 800–01, 104 S. Ct. at 3383. The search warrant was issued approximately nineteen hours later, upon which the police conducted a more thorough search of the apartment and found drugs, cash, and ammunition for a firearm. *Id.*

The district court suppressed all of the evidence seized from the apartment—the items discovered in plain view during the initial search and the items not in plain view that were discovered during the subsequent warrant search. *Id.* at 801–02, 104 S. Ct. at 3383–84. The court of appeals affirmed the district court as to the evidence discovered in plain view, holding that the evidence was properly suppressed because the warrantless entry was not

20

justified by exigent circumstances. *Id.* at 802, 104 S. Ct. at 3384. But the court of appeals reversed the district court's judgment as to the evidence seized under the valid search warrant. *Id.* at 803, 104 S. Ct. at 3384.

The Supreme Court was careful to indicate at the outset of its opinion that the Government had *not* challenged the portion of the lower court's opinion holding that exigent circumstances did *not* justify the initial warrantless entry. *Id.* at 804, 104 S. Ct. at 3385. Thus, the only issue before the Court was "whether drugs and the other items not observed during the initial entry and first discovered by the agents the day after the entry, under an admittedly valid search warrant, should have been suppressed." *Id.* It being undisputed that the initial warrantless entry (or search) was illegal, Segura took the opportunity to argue that an illegal *seizure* had also occurred, contending "that all of the contents of the apartment, seen and not seen, including the evidence now in question, were 'seized' when the agents entered and remained on the premises while the lawful occupants were away from the apartment in police custody." *Id.* at 805, 104 S. Ct. at 3386 (emphasis added). The Court observed that Segura had apparently advanced the argument in an attempt to avoid application of the independent source exception. *Id.* at 806, 104 S. Ct. at 3386. Indeed, "[i]f all the contents of the apartment were 'seized' at the time of the illegal entry and securing," then, as Segura's argument proceeded, "presumably the evidence now challenged would be suppressible as primary evidence obtained as a direct result of that entry." *Id.* But the Court disagreed with Segura's argument,

21

pointed out that "[a] seizure affects only the person's possessory interests; a search affects a person's privacy interests," and observed that it "has frequently approved warrantless seizures of property, on the basis of probable cause, for the time necessary to secure a warrant, where a warrantless search was either held to be or likely would have been held impermissible." *Id.* The Court held "that securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents. We reaffirm at the same time, however, that, absent exigent circumstances, a warrantless search . . . is illegal." *Id.* at 810, 104 S. Ct. at 3388.

After addressing Segura's seizure argument, the Supreme Court considered the admissibility of the evidence obtained pursuant to the search warrant and observed that "[n]one of the information on which the warrant was secured was derived from or related in any way to the initial entry into [Segura's] apartment; the information came from sources wholly unconnected with the entry and was known to the agents well before the initial entry." *Id.* at 814, 104 S. Ct. at 3390. The Court thus held:

> [T]he evidence discovered during the subsequent search of the apartment the following day pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed as "fruit" of the illegal entry because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence under *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S. Ct. 182, 64 L.Ed. 319 (1920).

22

*Id.* at 799, 104 S. Ct. at 3382.

### 1.    *Segura*'s Seizure Analysis

The State argues that the trial court could have denied Wehrenberg's motion to suppress based on the Supreme Court's holding addressing Segura's seizure argument, in which the Court stated,

> [W]here officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its contents and take them into custody and, for no more than the period here involved, secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures.

*Id.* at 798, 104 S. Ct. at 3382.

The State misreads *Segura*. Segura argued that an illegal seizure of the apartment's contents had occurred in an effort to head off any application of the independent source doctrine. The Supreme Court, however, held that there was no illegal seizure and proceeded to apply the independent source doctrine. The Court did not hold that the challenged evidence was admissible *because* there was no illegal seizure, as the State suggests. Indeed, that holding would have rendered the entire discussion of the independent source doctrine dicta. The evidence was instead admissible as a result of the independent source doctrine, which applied notwithstanding the undisputed illegality of the initial warrantless entry. Accordingly, the trial court could not have denied Wehrenberg's motion to suppress on this ground.

23

## 2. Independent Source Doctrine

In addition to *Segura*'s discussion, the Fifth Circuit has concisely explained the independent source doctrine as follows:

> The exclusionary rule of the Fourth Amendment generally prohibits the introduction at trial of not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence discovered later that is derivative of an illegality, or constitutes "fruit of a poisonous tree." The primary limit on this rule is that otherwise suppressible evidence will still be admitted if the connection between the alleged illegality and the acquisition of the evidence is "so attenuated as to dissipate the taint." One example of this "attenuation" limit is known as the "independent source" doctrine, which permits the introduction of unlawfully discovered evidence when the police have acquired that evidence through a distinct, untainted source. Animating this doctrine is the recognition that the goal of the exclusionary rule is to put the police "in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred." "When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation."

*United States v. Grosenheider*, 200 F.3d 321, 327 (5th Cir. 2000) (citations omitted).

Here, Investigator Montanez testified that all of the information contained in the search warrant affidavit was derived from facts that were made known to him by the confidential informant before the warrantless entry into the residence. We have reviewed the affidavit, and Investigator Montanez's testimony is accurate. Because the police did not rely upon any of the information that they may have gleaned during the initial warrantless entry to support their request for a search warrant, this case would appear to fall squarely within the parameters of the

24

independent source doctrine.  However, we have declined to apply the doctrine in a previous case.  In *Oliver v. State*, citing the Texas exclusionary rule, we reasoned as follows:

> The [federal] "independent source" and "inevitable discovery" exceptions advanced by the State are judicial exceptions to the judicially articulated exclusionary rule.  In this case we are dealing with art. 38.23 of the Texas Code of Criminal Procedure.  The article by its terms clearly excludes the admission into evidence of any evidence which has been illegally obtained.  The article contains no exceptions to the rule.  If there should be exception to the rule, similar to the exceptions which have been recently made to the exclusionary rule, such a change should come by way of amendment to art. 38.23, not by our ruling that the evidence is admissible in direct contradiction to the plain wording of the statute.[4]

711 S.W.2d 442, 445 (Tex. App.—Fort Worth 1986, pet. ref'd).  Although we may certainly revisit the reasoning underlying our prior opinion, we decline to do so in this circumstance because on no less than two occasions subsequent to *Oliver*, the court of criminal appeals has declined to recognize that the federal inevitable discovery doctrine is an exception to the statutory Texas exclusionary rule.  *See State v. Daugherty*, 931 S.W.2d 268, 269–73 (Tex. Crim. App. 1996); *Garcia v. State*, 829 S.W.2d 796, 798–800 (Tex. Crim. App. 1992) (citing *Oliver*).  Of course, the court of criminal appeals addressed the inevitable discovery doctrine, not the independent source doctrine, but the doctrines "are actually two sides of the same coin," at least according to the Fifth Circuit.  *See Grosenheider*, 200

---

[4]Among other authorities, Wehrenberg moved to suppress the challenged evidence under code of criminal procedure article 38.23.

F.3d at 328 n.8.  The Supreme Court has even stated as much:  "The inevitable discovery doctrine . . . is in reality an extrapolation from the independent source doctrine:  Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered."  *Murray v. United States*, 487 U.S. 533, 539, 108 S. Ct. 2529, 2534 (1988) (emphasis omitted).  In light of the court of criminal appeals's stance on the inevitable discovery doctrine, and considering that several federal courts, including the Supreme Court, do not draw a relevant distinction between the inevitable discovery doctrine and the independent source doctrine, we are hesitant to depart from our own precedent regarding the independent source doctrine.

Further, unlike the inevitable discovery doctrine, the court of criminal appeals has not squarely addressed whether or not the independent source doctrine applies in Texas.  In *State v. Powell*, police learned that appellee was making forged checks in his home, and they obtained a warrant to search his home and to seize, among other things, "checks and materials to make forged checks."  306 S.W.3d 761, 762 (Tex. Crim. App. 2010).  When the police executed the search warrant, they seized two safes—which they could have lawfully searched since the safes could have contained checks and materials for making forged checks—and took them to the police station, where they searched them the next day.  *Id.*  The safes contained methamphetamine, and appellee was charged with a drug-related offense.  *Id.*  The trial court suppressed the

26

evidence, and the court of appeals affirmed, concluding that the safes were not particularly described in the warrant as items to be seized. *Id.* at 764.

The court of criminal appeals disagreed with the lower court. *Id.* at 768. In part I of the opinion, the court explained that the affidavit stated that someone had used a forged check to buy a safe at Home Depot and that the warrant authorized the police to enter appellee's home and "to there search for the property described in the affidavit, and to seize the same and bring the same before me." *Id.* (emphasis removed). It held that the police could have seized both of the safes because they could have reasonably believed that one of the safes was the one that was purchased at Home Depot with a forged check and that was in the home. *Id.*

In part II of the opinion, the court of criminal appeals cited *Hudson v. Michigan*, 547 U.S. 586, 126 S. Ct. 2159 (2006), which cited *Segura*, and concluded as follows:

> [A]ssuming that the seizure of the safes by the police violated appellee's Fourth Amendment possessory rights in these safes, we believe that the 'massive' remedy of exclusion of the methamphetamine in this case is not required under the United States Supreme Court's decision in [*Hudson*], which decided that the violation by the police of the knock-and-announce Fourth Amendment rule that preceded an otherwise lawful search of the defendant's home pursuant to a search warrant did not require exclusion of evidence that was found during the search.

*Id.* at 769, 771. Because there was no causal connection between the unlawful seizure of the safes and the lawful search of the safes, the violation of appellee's

possessory interests in the safes had nothing to do with the lawful search of the safes, and the evidence should not have been suppressed. *Id.* at 770–71.

We decline to construe *Powell* as impliedly adopting the independent source doctrine. First, part II of the opinion is dicta. The court of criminal appeals concluded in part I that the safes were not improperly seized because they were particularly described in the affidavit. *Id.* at 768. Part II took the analysis an unnecessary step further, "assuming" that the seizure of the safes violated appellee's rights. *Id.* at 769. Indeed, four judges declined to join in part II of the opinion, describing it as "purely advisory." *Id.* at 772–73 (Price, J., dissenting) (Womack, Johnson, and Cochran, JJ., concurring).

Moreover, it is highly unlikely that the court of criminal appeals would have announced such a major development in Texas criminal jurisprudence without expressly considering the interrelationship between the independent source doctrine and article 38.23, as it did in *Garcia*, 829 S.W.2d at 798–800, and *Daugherty*, 931 S.W.2d at 269–73, when analyzing the inevitable discovery doctrine, and as it did in *Johnson v. State* when considering the attenuation doctrine's applicability in Texas. *See* 871 S.W.2d 744, 749–51 (Tex. Crim. App. 1994) ("If the evidence is not 'obtained' in violation of the law, then its admission into evidence is not in contravention of Art. 38.23.").

Accordingly, in light of the above authorities, we cannot affirm the trial court's denial in part of Wehrenberg's motion to suppress on the ground that the

28

federal independent source doctrine applies to except the challenged evidence from the Texas exclusionary rule.  We sustain Wehrenberg's only point.

## IV. CONCLUSION

Having sustained Wehrenberg's sole point, we reverse the trial court's orders denying Wehrenberg's motion to suppress in part and remand this case to the trial court for further proceedings.


BILL MEIER
JUSTICE

PANEL:  GARDNER, WALKER, and MEIER, JJ.

PUBLISH

DELIVERED:  November 8, 2012